Julie L. **LEWIS**, Plaintiff,

v.

**ZILOG, INC.**, Defendant.

Civ. A. No. 1:93–CV–2671–FMH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 5, 1995.

Loretta Jean Mirandola, Office of Loretta Jean Mirandola, Lawrenceville, Georgia, for plaintiff.

Hunter R. Hughes, III, Lisa Bodenstein Golan, Rogers & Hardin, Atlanta, Georgia, for defendant.

### *ORDER*

HULL, District Judge.

Plaintiff Julie L. Lewis files this employment discrimination action against Defendant Zilog, Inc. for disability discrimination under the Americans with Disabilities Act and for gender discrimination under Title VII. This matter is before the Court on Defendant Zilog's Motion for Summary Judgment [37–1] on all of Plaintiff's claims, Defendant's Motion to Amend Summary Judgment Papers to Correct Proofing Errors [39–1], Defendant's Motion to Extend Plaintiff's Time to Respond to Defendant's Motion for Summary Judgment [39–2], Plaintiff's Motion for Leave to File Statement of Issues and Citations [45–1], Plaintiff's Objection to the Submission and Consideration of Defendant's Inadmissible and Improper Evidence [54–1], Defendant's Motion for Leave to Supplement Citation of Authority in Support of Motion for Summary Judgment [56–1], and Defendant's Second Motion for Leave to Supplement Citation of Authority in Support of Motion for Summary Judgment [61–1].

The Court grants the parties' respective motions for extensions and to file supplemental briefs. The Court now addresses Defendant's Motion for Summary Judgment.

## I. FACTS

For purposes of Defendant's Motion for Summary Judgment, the Court adopts the version of the facts most favorable to Plaintiff.

### A. Plaintiff's Employment

In 1986, Plaintiff began working temporarily as a secretary for Defendant. In January, 1987, the position became permanent. Plaintiff performed her secretarial duties well and as a result was promoted twice in a short period. In 1992, Plaintiff's third promotion was to the position of Inside Sales Representative. In that capacity Plaintiff worked with Defendant's sales representatives and independent distributors who serviced small accounts. Among other duties, Plaintiff was required to be available to answer questions of procedure and policy to field representatives, to process orders, and to work to solve customer problems. Plaintiff was also responsible for maintaining effective communications between the regional field offices and the area manager and for keeping the area manager updated on all major activities.

From 1988 to June, 1992, Defendant's Atlanta office was staffed on a day to day basis by only Plaintiff and Brady Williams, Plaintiff's supervisor and later co-worker. Mr. Williams's strengths were not in the areas of detail and administration. Plaintiff often criticized Mr. Williams. According to Plaintiff, when Mr. Williams was Plaintiff's supervisor, Mr. Williams would leave the office to play golf and attend adult entertainment centers, and frequently not return customers' phone calls. Plaintiff reports that on one occasion when she was on sick leave, Plaintiff was called into the office to prepare some documents Mr. Williams was responsible for preparing. Plaintiff complains that Mr. Williams was not reprimanded for any of his behaviors.

In June, 1992, Defendant's Atlanta office was expanded with the addition of Bob Timms, Defendant's District Sales Manager. Ms. Lewis began reporting to Mr. Timms. In November, 1992, the office staff was increased to four with the hiring of Bob Mylacraine as Defendant's Key Account Manager for its Scientific Atlanta account.

### B. Plaintiff's 1993 Performance Evaluation

Prior to 1993, Plaintiff was given numerous favorable performance evaluations. However, the office atmosphere began to deteriorate. Mr. Timms began receiving complaints regarding some of Plaintiff's behaviors. Mr. Timms states that he observed Plaintiff exhibit belligerence regarding what should have been noncontroversial day to day activities. Mr. Timms brought these concerns to the attention of David Phillips, Defendant's Regional Sales Manager, in Dallas. Other employees also had contacted Mr. Phillips. Mr. Phillips received complaints not only about Plaintiff's inability to avoid confrontation in the Atlanta office, but also complaints from Defendant's manufacturer's representatives about the amount of time Plaintiff spent engaging in unproductive activity in the office.

Plaintiff stresses that she had a track record of good performance reviews and compliments from co-workers, customers, and representatives. Plaintiff's 1992 performance evaluation showed good solid performance and did not reference the problems that appeared just two months later in the performance evaluation given Plaintiff on February 23, 1993. Accepting this as true, the evidence, nonetheless, shows the atmosphere of the office deteriorated in 1993. In January, 1993, when the serious nature and extent of the problems Plaintiff was causing were brought to the attention of Mike Furman, Defendant's National Director of Sales, Mr. Furman immediately began discussions with field management about how to handle the problem.

In the meantime, on January 8, 1993, after a confrontation with John Wynn, one of Defendant's California sales managers, Plaintiff took a three week paid medical leave of absence. Plaintiff requested this medical leave of absence for "illness." In support of

her request, Plaintiff submitted a note, dated January 12, 1993, from Dr. Cox, her family physician. The note stated: "Please excuse Julie from work until 2–1–93. She may return to work on that date with *limited overtime* only!" Baumwell deposition, Exh. 6.

In February, 1993, Mr. Furman asked Mr. Timms to write a memo about the problems Plaintiff caused. Mr. Timms drafted a memo, dated February 17, 1993, which detailed the problems Plaintiff caused, as follows:

GA office problems:

* Julie incessantly berates other Zilog employees and reps to everyone

* Constant complaints about her work

* Always brings sexual innuendo into conversations

* Rebellious—resists any form of direction

* Her manner attempts to intimidate & threaten with something she may "have on you"—always appears to be building a case

* Poor communication skills—no listening, just telling

* Constantly interrupts co-workers on low priority issues

* Major attitude and mood swings

Furman deposition, Exh. 41. Based on the content of the memo and input from field representatives and employees, Mr. Furman advised Plaintiff in writing about the extent of the problems she was causing, and made it clear that Plaintiff must improve her conduct.

Defendant's policy provides that a performance improvement plan, known as a "PIP," may be given when an employee's performance is unsatisfactory, as follows:

When an employee's performance to the reasonable objectives and expectations of the position is or becomes an unsatisfactory, an employee may receive an "extraordinary review." Such a review is a "mini-MBO" in which the supervisor says to the employee, in writing, "your performance is unsatisfactory. Here are the things I expect you to accomplish/correct in the next thirty (30) or sixty (60) days in order to retain your position. If you do not accom-

plish/correct these things, you will no longer be employed in this position....

Because the extraordinary MBO is a step toward a termination, the document must be pre-reviewed with the supervisor's management, the Director or Manager of Human Resources and, if possible, the Corporate Legal Department, before the discussion with the employee.

At the end of the stated time period, the supervisor documents in writing on the MBO the accomplishment/corrections. If performance and behavior are substantially improved, the employee resumes a regular MBO cycle. If not, the supervisor so informs the employee, after consultation with management, Human Resources and the Legal Department, and after a termination Plan "for performance" is approved.

Zilog Procedure Manual, 60–27, Performance Evaluations—Indirect Labor Employees, Baumwell deposition, Exh. 23. Pursuant to Defendant's policy, Mr. Furman drafted a performance evaluation for Plaintiff which contained a performance improvement plan.

Mr. Furman decided that he would give Plaintiff the performance evaluation in person to insure that there was no misunderstanding by Plaintiff and to make it easier for Plaintiff to continue to have a productive relationship with her supervisors, Mr. Phillips and Mr. Timms. Mr. Furman flew to Atlanta and gave Plaintiff her performance evaluation on February 23, 1993, in the presence of Mr. Phillips and Mr. Timms.

The written performance evaluation that Mr. Furman reviewed with Plaintiff states that Plaintiff needed to improve her performance in two major areas, namely her efficiency and her work relationship with others. On the efficiency issue, the evaluation noted that Plaintiff was extremely talkative on the telephone and excessively mixed business with pleasure. As a result, calls that should have taken five minutes lasted twenty. It was also noted that Plaintiff needed to prioritize better—to recognize the relative importance of the issues she was raising and, whenever possible, to solve a problem with one phone call instead of three. It was suggested that Plaintiff could reduce her work hours if she were more efficient.

The second problem noted in Plaintiff's performance evaluation was her relations with others. The evaluation states that Plaintiff's moods varied. On some days Plaintiff would be easy to work with and on the others, "co-workers have to walk on eggshells so as not to set off her wrath." Lewis deposition, Exh. 9. It was also suggested that Plaintiff improve her relationship with Mr. Williams.

Plaintiff's performance evaluation also noted that Plaintiff had to work on her relationships with distributors. Plaintiff was directed to encourage them to buy products from Defendant, not to exhibit an attitude of superiority, and not to allow her moods to interfere with their wanting to do business with Defendant. Likewise, Plaintiff was directed to improve her relationship with Defendant's sales representatives, to treat them with respect, and not to talk down to them or talk disparagingly about them behind their backs. The evaluation also noted Plaintiff's constant complaints about her overwork and suggested that this was a function of her inefficiency.

Finally, the performance evaluation suggested that Plaintiff had to improve her listening skills and think how she could contribute positively to accomplish the Company's objectives. Plaintiff was told to listen rather than just talk and to "stop trying to intimidate or threaten those with whom she works." Lewis deposition, Exh. 9. Plaintiff was informed that she was frequently seen to be "building a case," which did not engender cooperation among her co-workers.

The performance evaluation was discussed at a review meeting scheduled to begin at 8:00 a.m. on February 23, 1993. Plaintiff did not arrive until 8:30 a.m. At the outset of the meeting, Mr. Furman gave Plaintiff an opportunity to state any complaints she generally had and then Mr. Furman attempted to go through the evaluation in detail. According to Mr. Furman, Plaintiff refused to cooperate. Mr. Furman testified that Plaintiff constantly jumped up and ran around the office pulling various files and telling Mr. Furman that she could demonstrate through these files the wrongdoing of others. When a specific inefficiency or other problem was raised, Plaintiff again reportedly responded by providing documents allegedly establishing the misconduct of others. Specifically, Plaintiff alleged that a former manager had a drinking problem, that a co-worker had at one time threatened her in 1988, that Plaintiff had a file on a co-worker allegedly showing that the co-worker had cheated on his expense accounts, and that Plaintiff's supervisor had a sexual relationship with a secretary in Defendant's Dallas sales office. At one particularly animated moment of the meeting, Plaintiff removed from the wall a picture of the employees in Defendant's Georgia office and proceeded to decapitate Mr. Williams symbolically in the picture before slicing the photographic representation of his head into small pieces.

Finally, Mr. Furman sat Plaintiff down and carefully went through the performance evaluation, which took almost three hours. After Plaintiff's performance evaluation, Mr. Phillips and Mr. Timms gave Plaintiff a copy of her written performance evaluation.

Plaintiff admits to engaging in many of the behaviors criticized in her February 23, 1993 performance evaluation. Plaintiff does not dispute that she had a personality conflict with Brady Williams and that she was bitterly at odds with him. Plaintiff's performance evaluation states that the bitter nature of her relationship with Mr. Williams was not all Plaintiff's fault. The evaluation states that Mr. Williams also would be encouraged to improve his relationship with Plaintiff.

With respect to personality conflicts with individuals other than Mr. Williams, Plaintiff admits that she raises her voice when provoked. Plaintiff also acknowledges having a conflict with John Wynn, an ESI representative. However, Plaintiff states that it is widely known that Mr. Wynn often gets into shouting matches with Defendant's employees.

Plaintiff further accedes to the statement of Mr. Phillips that she had been very confrontational and had contributed to making life difficult in Defendant's Georgia office. Specifically, Mr. Phillips stated that Plaintiff could not sabotage the whole organization and make the Georgia office nonfunctional because of her demands. Plaintiff responded

that Defendant should "get rid of" Brady Williams and that she had not invited Bob Mylacraine to work in the Georgia office. Finally, Plaintiff admits to "yacking" on the phone during work hours and to having numerous discussions regarding non-business matters with ESI representatives, including Mark Beddingfield, Larry Nash, and Myra Mason.

### C. Plaintiff's Second Medical Leave Of Absence

Following Plaintiff's February 23, 1993 performance evaluation, Plaintiff states that she was so distressed that she requested another medical leave of absence. In support of this second medical leave of absence, Plaintiff submitted a note, dated February 25, 1993, from Dr. Cox which stated: "Diagnosis: stress reaction job related. We recommend three month's disability for Julie with reevaluation 5/25/93." Plaintiff never returned to work from her second medical leave of absence in 1993.

In his deposition Dr. Rivers–Bulkeley, Plaintiff's psychiatrist, testified that after the shock and devastation of receiving her performance evaluation and being placed on a performance improvement plan, Plaintiff's medical condition was aggravated and her moods destabilized, making it impossible for Plaintiff to work for Defendant or at a similar job. On March 12, 1993, Dr. Cox wrote the following note:

We have recommended Julie Lewis [sic] for a new job. Her present job situation has deteriorated to where it is probably not salvageable and the stress has aggravated underlying emotional problems.

Lewis deposition, Exh. 2. Further, in her deposition Plaintiff indicated her unwillingness to return to work at Defendant's Georgia office.

Defendant's policy for medical leaves of absence provides that employees who take medical leaves of absence must return to their positions in four weeks, or their employment will be terminated, as follows:

The employee must request the medical leave of absence as far in advance as possible by submitting proper documentation from a physician and the reasons for the leave to his or her immediate manager. The Company will hold the employee's job for four (4) weeks. If the leave is longer than four (4) weeks, the Company will use its best efforts to return the employee to active status. If no opening exists, however, the employee will be so informed and his/her employment with Zilog will be terminated.

After an employee has been on a medical leave of absence for three (3) weeks, he or she will be sent a notification from Human Resources as a reminder of Zilog's right, per this procedure, to replace a person on medical leave after four (4) weeks.

Zilog Procedures Manual, Medical Leaves of Absence, 60–101, Baumwell deposition, Exh. 30. In accordance with this policy, Plaintiff was sent a letter on March 19, 1993, informing her of Defendant's right to terminate her employment once Plaintiff's medical leave reached four weeks.

### D. Plaintiff's Termination

By March 26, 1993, Plaintiff had not indicated that she would return to work and had remained on her second medical leave of absence for over four weeks. Accordingly, Defendant sent Plaintiff a termination notice advising that Defendant had notified Plaintiff previously about Defendant's medical leave policy. The letter further stated that Defendant was terminating Plaintiff's employment. The termination letter concluded: "At such time as your doctor provides you with a release to return to work, please notify the Human Resources Department of the date of your release. You will then be notified if a suitable opening is available at that time." Baumwell deposition, Exh. 30.

Since Plaintiff took her second leave of absence on February 25, 1993, Plaintiff continuously has received first short-term disability payments, then long-term total disability payments, as well as social security disability payments. Plaintiff continues to receive her long-term disability payments.

### E. Defendant's Knowledge of Plaintiff's Disability

Plaintiff suffers from bipolar mood disorder. Defendant contends that it was not

aware of Plaintiff's disability until she informed Messrs. Furman, Phillips, and Timms of her disability during the February 23, 1993 performance evaluation. Plaintiff disputes Defendant's alleged lack of knowledge of her disability. Defendants emphasize that Plaintiff's family doctor, Dr. Cox, testified that he was not aware that Plaintiff had bipolar mood disorder until he was informed of that fact by Dr. Rivers–Bulkeley on January 28, 1993. Dr. Cox testified that although he had engaged in some study of psychiatric conditions, he found Plaintiff's condition to be "an enigma" and difficult for him to recognize. Defendants emphasize that Dr. Cox's notes, which Plaintiff submitted for her two medical leaves of absence, referred to only job related stress and did not mention bipolar mood disorder.

To show Defendant's knowledge, Plaintiff stresses that she provided James Taylor, a former Personnel Director for Defendant, an October 17, 1988 letter from her psychiatrist, Dr. Rivers–Bulkeley, reflecting that Plaintiff was being treated with lithium carbonate. Defendant's records do not contain this document, and the note was never placed into Plaintiff's employee records. Plaintiff admits that she requested that this note and its content be kept confidential. None of Defendant's employees recalls ever seeing this note.

Plaintiff contends that Defendant was alerted to her mental disability also by Plaintiff's three week paid medical leave of absence for job-related stress from January 8, 1993 to February 1, 1993. On January 8, 1993, Plaintiff engaged in a confrontation over the telephone with one of Defendant's sales managers in California. Following that confrontation, Plaintiff left the office and asked for a three week leave of absence due to illness. Plaintiff submitted a note from Dr. Cox, dated January 12, 1993, that states: "Diagnoses acute stress." Plaintiff advised Mr. Timms that this leave was for job-related stress and a peptic ulcer. Plaintiff later told Mr. Timms that she had a permanent medical condition and could not take any more stress. Plaintiff's first medical leave of absence in 1993 ended February 1, 1993.

To further establish Plaintiff's knowledge, Plaintiff also stresses that Dr. Rivers–Bulkeley sent a note, dated February 12, 1993, wherein he advised that Plaintiff had a mental condition. Dr. Rivers–Bulkeley's note states:

Julie Lewis has been a patient under my care continuously since January 28th. She has experienced significant stress at work unrelated to her actual job description. This has resulted in an unstable mood state, and aggravated her previously stable psychiatric condition.

Lewis deposition, Exh. 2. Plaintiff states that this note was sent to Julia Hassett, an administrator with Defendant. Plaintiff does not know whether Ms. Hassett ever received this note, or with whom Ms. Hassett shared the note if she received it. This document also is not in Plaintiff's employee records.

Finally, Plaintiff points to her request for a second medical leave of absence in 1993, contained in a handwritten note from Dr. Cox, dated February 25, 1993, which states: "Diagnosis: stress reaction job related. We recommend three months disability for Julie with reevaluation 5/25/93." This note from Dr. Cox was written after Plaintiff was given her February 23, 1993 performance evaluation and performance improvement plan.

### F. Plaintiff's Transfer Requests

Prior to taking her second medical leave of absence, Plaintiff asked Mr. Phillips in January, 1993 if she could transfer to Defendant's home office in California. Mr. Phillips relayed the request to Sally Baumwell, Defendant's Vice President of Human Resources. Ms. Baumwell responded that there were not any openings in the desired classification. Apparently dissatisfied with that response, Plaintiff first went to the EEOC asking about her rights and how she could use them to get a transfer to California.

Plaintiff next called Ms. Baumwell stating that she wanted a transfer because she could no longer work with Brady Williams. Plaintiff states that, among other things, Mr. Williams unfavorably changed Plaintiff's 1991 review, and failed, prior to Mr. Timms's arrival, to be in the office to assist her on one occasion when carpet was being installed.

Plaintiff also cited her conflict with Chuck Beam, a former manager in the Georgia office who was involuntarily terminated in 1987. Plaintiff told Ms. Baumwell that all of the above was causing her stress in 1993, which she could not take because of what Plaintiff characterized as a permanent medical condition.

At Plaintiff's request and between February 5 and February 15, 1993, Ms. Baumwell sent Plaintiff a copy of Defendant's job openings as of February 5, 1993. On February 15, 1993, Plaintiff sent Ms. Baumwell an E-mail, which Plaintiff copied to Mr. Timms and Mr. Phillips, asking about the procedure to apply for a job opening. On February 16, 1993, Ms. Baumwell responded telling Plaintiff that there was no formal procedure by which an exempt employee could apply for another position within the company and directed Plaintiff to discuss her interests with her manager Mr. Timms, and assuming he approved, to contact Ms. Baumwell's assistant, Tony Perez, regarding any opening for which she sought to apply. On February 17, 1993, Ms. Baumwell sent Plaintiff an E-mail to inform Plaintiff that Ms. Baumwell had told Tony Perez to expect Plaintiff to contact him regarding open positions and that Mr. Perez had indicated he had not yet heard from Plaintiff.

On February 17, 1993, a new Zilog job postings came out and this posting was immediately forwarded to Plaintiff at the Georgia office. On February 22, 1993, Plaintiff sent an E-mail asking about applying for one of the positions listed on that job posting. Plaintiff also indicated that she wanted to be considered for any other openings in Campbell, California. Mr. Perez returned Plaintiff's call that day, but she never returned his call.

Mr. Furman met with Plaintiff on February 23, 1993 and gave Plaintiff the performance evaluation. Plaintiff raised her desire to be transferred to California. Mr. Furman responded by telling Plaintiff that pursuant to normal company guidelines she could follow the standard procedure for applying for a transfer, but that transfers generally were not granted to a person who was on a corrective action notice.

Following the review of Plaintiff's performance evaluation, Plaintiff asked Mr. Phillips about Defendant's policy on transfers. Mr. Phillips told Plaintiff that his understanding was that she could apply for open positions on a competitive basis.[1]

## G. *Promotion*

Plaintiff was not promoted to the position of Key Accounts Manager. Instead, in November, 1992, Defendant hired Bob Mylacraine as Key Account Manager for Defendant, handling its Scientific Atlanta Account. The position required someone with either a technical background, i.e., an electrical engineering degree, or equivalent experience. Mr. Mylacraine had over ten years experience as an account sales manager with Electronic Sales, Inc. ("ESI"), one of Defendant's distributors. Mr. Mylacraine had been assigned the Atlanta branch sales responsibility for ESI in 1989. His accomplishments in his work area included managing a ten year plus Zilog relationship with Hayes Microcomputer Products concerning technical design and sales; successfully winning business from Northern Telecom; and establishing for Mr. Phillips a Zilog profile in engineering specification for remote control products and closed caption television products. Based on his relevant experience, Defendant hired Mr. Mylacraine into the Key Account Manager position. Plaintiff failed to hold the necessary qualifications to be considered for this position and Bob Mylacraine was well qualified for the position.

## H. *Training*

On February 4, 1993, Anne Babcock, a training clerical, sent out E-mail invitations for the February 15, 1993 Zilog Management Fundamental ("ZMF") training session to the

1. In addition to the transfer request, Plaintiff requested two medical leaves of absence in 1993 which Defendant granted. Plaintiff's only other medical requests were for periodic doctors' visits over a five year period. No such request was ever denied. On occasion, Plaintiff rescheduled doctors' visits to accommodate her work schedule, but she was never prevented from attending any requested appointment.

newly hired . Bob Mylacraine. The ZMF training is aimed mainly at new employees at higher classification levels. As space is available and as budgets allow, other employees may be invited. Shortly after the invitations went out, Plaintiff called Ms. Babcock to inquire who had been invited to attend and to ask why Mr. Mylacraine had been invited and she had not. Ms. Babcock told her that new hires received first consideration for this training session and as Plaintiff was not a new hire, the course would be of marginal value to her.

Plaintiff never asked anyone in her chain of command if she could attend a ZMF training session and no one in her chain of command ever refused a request by her for training. Once Plaintiff made her desire to attend ZMF training known to her superiors, Plaintiff's name was put on a list of employees who had made such a request. Plaintiff further states that she had been promised similar training in the past and had never received it. Additionally, Plaintiff states that only males were invited to the February 15, 1993 ZMF training session.

### I. Hostile Work Environment

. Plaintiff's hostile work environment claim is based on the allegedly improper conduct of co-worker Bob Mylacraine. According to Plaintiff, Bob Mylacraine created an odor in a bathroom located close to Plaintiff's desk, wore pants with a hole in the crotch, had on his desk a picture of his professional body-building wife, and used the expression: "I'm sitting here holding my dick in my hand" in telephone conversations with others.

Plaintiff complained about Bob Mylacraine's behavior to Mr. Timms. When Plaintiff informed Mr. Timms about the bathroom odor, Mr. Timms spoke to Bob Mylacraine. When Plaintiff complained of the less than tactful comment, Mr. Timms reprimanded Bob Mylacraine. Plaintiff never complained to Mr. Timms about any other matters. Plaintiff never complained to Ms. Baumwell regarding any such alleged misconduct. Likewise, Plaintiff's January 29, 1993 Intake questionnaire with the EEOC and March 12, 1993 Charge of Discrimination are devoid of any such claims.

### J. Plaintiff Contacts EEOC

As mentioned *supra,* Plaintiff visited with the EEOC on January 29, 1993. Plaintiff claims she told Mr. Timms, Mr. Mylacraine, and Ms. Baumwell about her visit with the EEOC prior to her February 23, 1993 performance evaluation.

Plaintiff does not allege that she told Mr. Furman or Mr. Phillips about her contacting the EEOC. Mr. Furman made the decision that Plaintiff should be given a performance improvement plan or PIP, and Mr. Furman states he was not aware that Plaintiff had contacted the EEOC.

### II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) defines the standard for summary judgment as follows: courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The general rule of summary judgment in the Eleventh Circuit states that the moving party must show the court that no genuine issue of material fact should be decided at trial. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–09 (11th Cir.1991). Unless the movant for summary judgment meets its burden under Federal Rule of Civil Procedure 56, the obligation of the opposing party does not arise even if no opposing evidentiary material is presented by the party opposing the motion. *Clark,* 929 F.2d at 607–08.

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. Tech-South, Inc.,* 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely

colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510.

■ Where neither party can prove either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the opposing party will not be able to meet its burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court interpreted Federal Rule of Civil Procedure 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

### III. *PLAINTIFF'S ADA CLAIMS*

■ The Americans with Disabilities Act of 1990 ("ADA"), as amended by the Civil Rights Amendments Act of 1991, 42 U.S.C. § 12101 *et seq.* (1994), prohibits an employer from discrimination based upon the known physical or mental impairments of a qualified individual with a disability. 42 U.S.C. § 12112 (1994). In order to state a claim under the ADA, Plaintiff first must show that she is a "qualified individual with a disability" within the meaning of the ADA. 42 U.S.C. § 12112 (1994); *Jackson v. Veterans Administration,* 22 F.3d 277, 278 (11th Cir.1994); *Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993). The ADA defines "qualified individual with a disability" as an "individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (1994); 29 C.F.R. § 1630.2(m) (1993); *School Bd. of Nassau County v. Arline,* 480 U.S.

273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987). Thus, to be a "qualified individual with a disability," Plaintiff must show (1) that she has a disability, and (2) that she can perform the essential functions of her job despite her disability, or, can perform the essential functions of her job with a reasonable accommodation for her disability.

■ Once Plaintiff satisfies the requirement of being a "qualified individual with a disability," Plaintiff then must show that Defendant discriminated against her because of her disability. Discrimination based on a disability may occur in numerous ways. In this case, Plaintiff alleges that Defendant treated her adversely because of her known disability and failed to reasonably accommodate her known disability.

### A. *"Qualified Individual With A Disability"*

For the purposes of this Motion for Summary Judgment, Defendant concedes that Plaintiff can make a showing that she has a disability within the meaning of the ADA.[2] Thus, Plaintiff now must show that she is a "qualified individual with a disability" who can perform the essential functions of her position despite her disability, or, can perform the essential functions of her job with a reasonable accommodation for her disability.

Defendant contends that Plaintiff cannot show that she is a "qualified individual with a disability." First, Defendant argues that since Plaintiff claimed in her application for long term disability benefits that she was unable to work and totally disabled, Plaintiff is now estopped as a matter of law from asserting that she is a "qualified individual with a disability" within the meaning of the ADA. Second, Defendant argues (1) that if Plaintiff's disability causes her to be a disruptive force in the workplace, Plaintiff then cannot perform the essential functions of her job, which include communicating effectively with Defendant's other employees, and (2) that even if Plaintiff can perform the essen-

---

**2.** The first issue typically for consideration in ADA claims is whether an individual has a disability, i.e., "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (1994). However, for purposes of this Motion Defendant has assumed that Plaintiff's bipolar mood disorder constitutes a "disability" under the ADA.

tial functions of her job with an accommodation, Plaintiff's only requested accommodation is unreasonable.

### 1. *Plaintiff's Admitted Total Disability Precludes ADA Claim*

■ Subsequent to the termination of her position, Plaintiff applied for and currently receives long-term disability benefits. A condition precedent to receiving long-term disability benefits is that the employee be totally disabled to perform any job. In applying for long-term disability benefits from Defendant, Plaintiff claimed that she was totally unable to work and to perform any job. Therefore, Defendant argues that Plaintiff be precluded from arguing that she is a qualified individual with a disability within the meaning of the ADA.

Several courts have held that an employee's claiming total disability in order to receive disability payments precludes that employee's ADA claim. *See August v. Offices Unlimited, Inc.*, 981 F.2d 576 (1st Cir.1992) (finding that under analogous portions of Massachusetts's anti-handicap discrimination statute that the plaintiff, who applied for and received long-term disability claiming he was totally disabled, was estopped from later contending that he was a qualified handicapped individual with a disability); *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 771 (8th Cir.1987) (affirming dismissal of plaintiff's Rehabilitation Act claims where plaintiff claimed on insurance forms that she was totally disabled), *cert. denied*, 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988);[3] *Harden v. Delta Air Lines*, 900 F.Supp. 493 (S.D.Ga.1995) (granting summary judgment against plaintiff who represented he was totally disabled for purposes of receiving long term disability benefits); *McNemar v. The Disney Stores, Inc.*, 4 A.D. Cases (BNA) 897,

1995 WL 390051 (E.D.Pa.1995) (granting summary judgment for defendant and holding that Plaintiff was precluded from arguing that she was a qualified individual with a disability); *Kennedy v. Applause, Inc.*, No. 94–5334, 1994 WL 740765, 1994 U.S.Dist. LEXIS 19216 (C.D.Cal. Dec. 7, 1994) (granting summary judgment on plaintiff's ADA claim because she was collecting disability payments based on inability to work); *Reigel v. Kaiser Found. Health Plan*, 859 F.Supp. 963 (E.D.N.C.1994) (granting summary judgment because a plaintiff receiving total disability benefits could not claim that she was a qualified individual with a disability).

In this case, Plaintiff applied for long-term benefits claiming that she was totally disabled and unable to work. Defendant's insurance carrier apparently agreed with her and approved Plaintiff's application for long-term benefits, which Plaintiff currently receives. Further, Plaintiff took a medical leave of absence from work on February 23, 1993, claiming that she could not work, and has not attempted to return to her job since that date. Dr. Rivers–Bulkeley, Plaintiff's psychiatrist, testified that Plaintiff is unable to work and that he could not think of any accommodation which would enable Plaintiff to return to work. Dr. Rivers–Bulkeley also testified that Plaintiff's medical condition makes it impossible for Plaintiff to work for Defendant or at a similar position. Finally, Plaintiff testified that she is unwilling to return to work at Defendant's Georgia office. Under these facts, the Court finds not only that Plaintiff has not shown that she is a "qualified individual with a disability," but that Plaintiff is precluded or estopped as a matter of law from claiming that she is a "qualified individual with a disability" accorded protection under the ADA.[4]

---

**3.** The ADA specifically provides that it shall be construed consistent with the Rehabilitation Act of 1973, 29 U.S.C. § 793 (1994), and the regulations issued pursuant to the Rehabilitation Act. *See* 42 U.S.C. § 12201(a) (1994). The legislative history of the ADA notes that the definition of "qualified individual with a disability" is "comparable to the definition used in regulations implementing Section 501 and Section 504 of the Rehabilitation Act of 1973. S.Rep. No. 116, 101st Cong., 1st Sess. 26 (1989).

**4.** Defendant argues that Plaintiff's mere application for long-term disability based on total disability estops Plaintiff from claiming that she is a "qualified individual with a disability." However, this Court is not required to decide here whether merely applying for long term disability will preclude ADA relief because Plaintiff not only applied for, but is receiving long-term disability, and the undisputed facts in the record support the conclusion that Plaintiff is not a "qualified individual with a disability." *See Au-*

### 2. Plaintiff Has Not Shown That She is a "Qualified Individual with a Disability"

■ Alternatively, if Plaintiff's total disability does not preclude her ADA claim, the Court finds that Plaintiff is not a "qualified individual with a disability" under the ADA because Plaintiff cannot perform the essential functions of her job even with an accommodation, and, in any event, Plaintiff's requested accommodation of a transfer is unreasonable as a matter of law.

■ Under the ADA, Plaintiff must offer Defendant a suggestion of a reasonable accommodation which would allow her to perform the essential functions of her job. *See generally* 29 C.F.R. Pt. 1630, App., at 416–17 (1993); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993) (discussing analogous provisions of the Rehabilitation Act). Plaintiff's only requested accommodation was a transfer to California. The issue becomes whether Plaintiff can perform the essential functions of her job with an accommodation of a transfer to California, and if so, whether a transfer to California is a reasonable accommodation. *Vande Zande v. State of Wisconsin Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir.1995).[5]

Defendant contends that Plaintiff is not a "qualified individual with a disability" because Plaintiff has not shown that she can perform the essential functions of her job even with the accommodation of a transfer. Defendant reasons that maintaining an effective and noncombative atmosphere in the workplace is fundamental to the performance of Plaintiff's position. According to Defendant, if Plaintiff cannot satisfy her responsibility of contributing to an effective work atmosphere and avoiding unnecessary confrontation, then Plaintiff is not qualified for the position which she holds. Defendant concludes that Plaintiff has presented no evidence that transferring Plaintiff to California would enable her to perform the essential functions of her job.

Plaintiff counters that she had a track record of good performance reviews and compliments from co-workers, customers, and representatives. Plaintiff's last performance review, prepared less than two months before Plaintiff was placed on the performance improvement plan tantamount to probation, showed good solid performance and did not reference the problems that appeared in Plaintiff's February 23, 1993 PIP. Plaintiff's argument is that Plaintiff has performed well in the past, and can perform well again in the future, but only with the reasonable accommodation of a transfer to California.

The Court finds that Plaintiff presents no evidence which establishes that a transfer will provide an accommodation for her disability or that she can perform the essential functions of her job with a transfer. Indeed, the evidence shows otherwise. Dr. Rivers–Bulkeley, Plaintiff's own psychiatrist, testified that he did not know what, if anything, could be done by Defendant to allow Plaintiff to return to work. Dr. Rivers–Bulkeley testified that Plaintiff's medical condition makes it impossible for Plaintiff to work for Defendant or at a similar job.

In addition, Plaintiff's claiming that she is unable to work and receipt of long-term disability benefits also shows that Plaintiff cannot perform the essential functions of her job. Numerous cases have held that a plaintiff with a total disability or with numerous sporadic absences cannot perform the essential functions of her job because she cannot show that she can maintain a regular and reliable level of attendance at her job. *See,*

gust v. Offices Unlimited, Inc., 981 F.2d 576 (1st Cir.1992).

5. The Court notes that Defendant contends that even if Plaintiff requested a transfer to California in 1993, Plaintiff never made her bipolar mood disorder disability known to Defendant and never requested a transfer to accommodate a known disability. As outlined *infra,* the Court finds that Defendant did not have knowledge Plaintiff had a bipolar mood disorder until after February 23, 1993. However, the Court does not discuss those issues because, even assuming *arguendo* Plaintiff requested a transfer to accommodate a known disability, the Court finds that Plaintiff has not presented evidence that she could perform the essential functions of her job with an accommodation of a transfer and that even if she could, the transfer request under the particular facts here is not a reasonable accommodation under the ADA as a matter of law.

*e.g., Tyndall v. National Educ. Ctrs.,* 31 F.3d 209, 213 (4th Cir.1994) (an employee must be willing and able to demonstrate, for an ADA claim, the skills necessary to perform the job in question by coming to work on a regular basis); *Jackson v. Veterans Admin.,* 22 F.3d 277, 278–79 (11th Cir.), *reh'g denied,* 30 F.3d 1500 (11th Cir.1994) (employee with numerous sporadic absences not "otherwise qualified" under the Rehabilitation Act); *Law v. United States Postal Serv.,* 852 F.2d 1278, 1279–80 (Fed.Cir.1988) (attendance is a minimum function of any job); *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768, 771 (8th Cir.1987) (because plaintiff conceded total disability and was therefore unable to perform essential functions of her job, the Court held she did not meet the prerequisites for protection under the provisions of the Rehabilitation Act); *Carr v. Reno,* 23 F.3d 525, 529 (D.C.Cir.1994) (holding that "coming to work regularly" is an "essential function"); *Johnston v. Morrison, Inc.,* 849 F.Supp. 777, 779 (N.D.Ala.1994) (holding under ADA employee's inability to work necessary hours justified termination); *EEOC v. AIC Sec. Investigation,* 820 F.Supp. 1060, 1064 (N.D.Ill.1993) (for the purposes of an ADA claim, "attendance is necessary to any job...."); *Walders v. Garrett,* 765 F.Supp. 303, 309 (E.D.Va.1991) (granting summary judgment on Rehabilitation Act claim for the employer because the plaintiff could not work due to her Chronic Fatigue Syndrome; "few would dispute that, in general, employees cannot perform their job successfully without meeting some threshold requirement of both attendance and regularity."), *aff'd,* 956 F.2d 1163 (4th Cir.1992); *Santiago v. Temple University,* 739 F.Supp. 974, 979 (E.D.Pa.1990) ("Attendance is necessarily the fundamental prerequisite to job qualification"), *aff'd,* 928 F.2d 396 (3d Cir.1991); *Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn.1986) (an employee who "does not come to work cannot perform any of his job functions, essential or otherwise...."), *aff'd,* 831 F.2d 298 (6th Cir. 1987).

Plaintiff took a three week medical leave of absence from January 8, 1993 to February 1, 1993. On February 1, 1993, Plaintiff returned to work for three weeks before taking a second medical leave of absence on February 23, 1993. At that time Plaintiff claimed she was unable to work and has not attempted to return to work since. Since the undisputed evidence shows that Plaintiff cannot maintain a regular level of attendance at her job, and further is receiving long term disability payments claiming she is unable to work and totally disabled, the Court finds that Plaintiff is not a "qualified individual with a disability" because she cannot perform the essential functions of her position.[6]

■ In any event, even assuming *arguendo* Plaintiff could come to work and could perform her job with a transfer to California, many courts have held that a transfer is not a reasonable accommodation as a matter of law. Under the ADA, once an employer is on notice that an employee is disabled, that employer is obligated to "reasonably accommodate" that employee's disability. 42 U.S.C. § 12112(b)(5)(A) (1994). The use of the word "reasonable" as an adjective for the word "accommodate" connotes that an employer is not required to accommodate an employee in any manner in which that employee desires. The term "reasonable," as it is employed in the ADA, would have no meaning if employers were required to provide employees the maximum accommodation or every conceivable accommodation possible. 29 C.F.R. Pt. 1630, App., at 416 ("the employer providing the accommodation has the ultimate discretion to choose between effective accommodation or the accommodation that is easier to provide."). *See Vande Zande v. State of Wisconsin Dept. of Administration,* 851 F.Supp. 353, 61, 362 (W.D.Wis. 1994) ("reasonable accommodation does not require an employer to provide every accommodation that a disabled employee requests."), *aff'd,* 44 F.3d 538 (7th Cir.1995).

**6.** As stated by the Court in *Kennedy v. Applause, Inc.,* 1994 WL 740765, 1994 U.S.Dist. LEXIS 19216 (C.D.Cal. Dec. 7, 1994), "Plaintiff in the case *sub judice* cannot speak out of both sides of her mouth with equal vigor and credibility before this Court. Plaintiff now seeks money damages from [her employer] on her assertion that she was able to work during the same period that she was regularly collecting disability payments on her assertion that she was physically unable to work." *Id.,* 1994 WL 740765 at *4, 1994 U.S.Dist. LEXIS 19216 at *11.

In other words, Plaintiff is not entitled to the accommodation of her choice, but only to a reasonable accommodation.

Several courts have held that transferring disabled individuals solely to allow the employee to work in a different setting or under a different supervisor is not an accommodation reasonably to be expected. *See Mazzarella v. United States Postal Serv.*, 849 F.Supp. 89, 95 (D.Mass.1994) (holding that it was not reasonable for employer to juggle personnel to entirely remove the possibility that a supervisor might offend a particular employee); *Mancini v. General Elec. Co.*, 820 F.Supp. 141, 148 (D.Vt.1993) (granting summary judgment against an employee who claimed he was entitled to a transfer because his current supervisor was the alleged source of the emotional problem which led to the employee's misconduct). Employers are entitled to assign personnel as their needs dictate and are not required to make transfers in order to avoid further insubordination problems on the part of the employees. *Adams v. Alderson*, 723 F.Supp. 1531, 1532 (D.D.C.1989), *aff'd sub nom., Adams v. G.S.A.*, No. 89–5265, 1990 WL 45737 (D.C.Cir. Apr. 10, 1990).[7] Forcing transfers of employees under the guise of reasonably accommodating employees under the ADA inherently would undermine an employer's ability to control its own labor force. Additionally, it would give disabled employees preferential treatment to transfers over non-disabled persons. The ADA does not require a "qualified individual with a disability" to be favored over an individual who is not disabled. *Felde v. City of San Jose*, 839 F.Supp. 708, 711 (N.D.Cal.1994). *Compare Alexander v. Choate*, 469 U.S. 287, 300, 105 S.Ct. 712, 719, 83 L.Ed.2d 661 (1985) (Rehabilitation does not require equal results; it assures even handed treatment); *Anderson v. University of Wis.*, 841 F.2d 737, 740 (7th Cir.1988) ("The Rehabilitation Act forbids discrimination based on stereotypes about a handicap, but it does not forbid decisions based on actual attributes of the handicap.").

The Court agrees with the above decisions and finds that Plaintiff's request to accommodate her now known disability by allowing her to be transferred to California is unreasonable and not a reasonable accommodation under the ADA as a matter of law.

### B. *Performance Improvement Plan or PIP*

In addition to her allegations that Defendant failed to reasonably accommodate her disability, Plaintiff contends Defendant discriminated against her by making adverse employment decisions because of her disability. Plaintiff alleges Defendant gave her a performance improvement plan (which Plaintiff contends is tantamount to probation) because of her disability and then terminated her because of her disability.

Employees can show discrimination under the ADA by showing that they have been treated differently because of their disability or that they suffered an adverse employment decision because of their disability. *Smith v. Upson County*, 859 F.Supp. 1504 (M.D.Ga.1994). However, before an employer can discriminate against an employee because of that employee's disability, the employer must be aware of that disability. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (employee alleging unlawful retaliation must show employer's knowledge of protected activity); *Morgan v. Massachusetts Gen. Hosp.*, 901 F.2d 186, 194 (1st Cir.1990) (same); *Smith v. State of Georgia*, 684 F.2d 729, 730 (11th Cir.1982) (same); *DeAnda v. St. Joseph Hospital*, 671 F.2d 850, 856 (5th Cir.1982) (same). Indeed, the ADA prohibits discrimination against employees with "known" disabilities. 42 U.S.C.

---

7. Additionally, several courts have held that an employer may not be subject to liability for correcting employee misconduct, even if the conduct was caused by a qualifying disability or handicap. *See, e.g., Severino v. North Fort Myers Fire Control Dist.*, 935 F.2d 1179, 1183 (11th Cir.1991) (finding that the Rehabilitation Act does not subject employers to liability for maintaining appropriate discipline in the workplace); *Misek–Falkoff v. IBM Corp.*, 854 F.Supp. 215, 227 (S.D.N.Y.1994) (finding that an employee, disabled or not, must be able to get along with co-workers and supervisors); *Carrozza v. Howard County*, 847 F.Supp. 365, 367 (D.Md.1994) ("Where there is misconduct, even if the misconduct was caused by a qualifying handicap ... the Rehabilitation Act does not bar termination or other disciplinary proceedings.").

§ 12112(b)(5)(A) (1994). Plaintiff has not shown that Defendant knew of her disability at the time the decision was made to give Plaintiff a performance improvement plan or PIP during her February 23, 1993 performance evaluation.

In order to meet the ADA's knowledge requirement, Plaintiff must show that the individual(s) responsible for making the decision to give her a PIP knew Plaintiff had a disability at the time the decision was made. *See Landefeld v. Marion Gen. Hosp. Inc.*, 994 F.2d 1178, 1181 (6th Cir.1993) (finding that the pertinent knowledge is that of the individual who made the decision that the plaintiff contended constituted discrimination). It is undisputed that the individual responsible for the decision to place Plaintiff on a PIP was Mr. Furman. After reviewing the record, the Court finds that although there may be a factual issue whether Mr. Furman may have been aware that Plaintiff had some sort of medical condition related to stress, there is no evidence that Mr. Furman had knowledge of Plaintiff's bipolar mood disorder at the time he made the decision to place Plaintiff on a PIP.

Noticeably, Plaintiff does not contend that she ever told Mr. Furman, or anyone else for that matter, that she suffered from bipolar mood disorder. Rather, Plaintiff primarily relies on five items which she asserts demonstrate that Defendant knew of her disability at the time she received her PIP: (1) an October 17, 1988 letter from Dr. Rivers–Bulkeley about lithium carbonate sent by Plaintiff to then Personnel Manager, James Taylor; (2) Plaintiff's three week medical leave of absence for stress from January 8, 1993 to February 1, 1993; (3) Plaintiff's sending a February 12, 1993 letter to an employee of Defendant; (4) Plaintiff's telling Defendant's Vice President of Personnel, Sally Baumwell, that she had a permanent medical condition; and (5) Plaintiff's having taken leaves of absence and having stated to co-workers and supervisors that she takes Prozac. The Court addresses each of these items.

First, the October 17, 1988 letter from Plaintiff's psychiatrist does state that Plaintiff was being treated with the medication lithium carbonate. The letter was printed on Atlanta Mood Disorders Center letterhead. However, Defendant's records do not contain this document. Even if the letter was sent to Defendant's former Personnel Director, it was never placed into Plaintiff's employee records. Also, Plaintiff admits that she requested that this letter, and its content, be kept confidential. None of Defendant's employees recalls ever seeing this note. Thus, at most, Plaintiff has raised a jury issue whether James Taylor saw this letter, but not Mr. Furman (or Messrs. Phillips or Timms).

Next, Plaintiff's three week leave of absence for job-related stress from January 8, 1993, to February 1, 1993 did not alert Defendant to Plaintiff's mental disability of bipolar mood disorder. On January 8, 1993, Plaintiff engaged in a confrontation over the telephone with one of Defendant's sales managers in California. Following that confrontation, Plaintiff left the office and asked for a three week leave of absence due to illness. Plaintiff submitted a note, dated January 12, 1993, from Dr. Cox stating: "Diagnosis acute stress." Plaintiff advised Mr. Timms that this leave was for job-related stress and a peptic ulcer. Plaintiff alleges she later told Mr. Timms that she had a permanent medical condition and could not take any more stress. Plaintiff, however, does not allege that she told any of Defendant's employees that she had bipolar mood disorder or any other mental disability.

Plaintiff also states that her psychiatrist, Dr. Rivers–Bulkeley, sent Defendant a note, dated February 12, 1993, wherein Dr. Rivers–Bulkeley advised that Plaintiff had experienced stress at work resulting in an unstable mood state. Plaintiff states that this note was sent to Julia Hassett, an administrator with Defendant. Plaintiff does not know whether Ms. Hassett ever received this note, or with whom Ms. Hassett shared the note if she received it. This document also is not in Plaintiff's employee records. Plaintiff also stresses her request for a second medical leave of absence contained in a handwritten note dated February 25, 1993 from Dr. Cox which states: "Diagnosis: stress reaction job related. We recommend three months dis-

ability for Julie with reevaluation 5/25/93." However, Plaintiff's request for a second medical leave of absence, contained in this note, was made after Plaintiff was given her February 23, 1993 performance evaluation and PIP.

Finally, Plaintiff emphasizes that it was widely known among her co-workers and supervisors that she took Prozac.

A disability covered under the ADA is one that substantially limits one or more of the major life activities of an individual. 42 U.S.C. § 12102 (1994). Accepting all of Plaintiff's allegations as true, the Court finds that Plaintiff has not presented sufficient evidence to create a jury issue whether Mr. Furman was aware of her covered disability at the time he made the decision to place Plaintiff on a performance improvement plan or PIP. *Cf. Miller v. National Casualty Co.,* 61 F.3d 627 (8th Cir.1995) (affirming grant of summary judgment based on lack of knowledge that employee was a manic-depressive where employee reported that she was experiencing stress and where employee's family members contacted employer informing that employee was "falling apart" and that family members were trying to get her into the hospital); *McIntyre v. Kroger,* 3 A.D. Cases (BNA) 117, 863 F.Supp. 355 (N.D.Tex.1994) (letter from doctor typed on letterhead of psychiatric hospital requesting the plaintiff be transferred for a "health disorder" was insufficient as a matter of law to put defendant on notice that plaintiff had a covered disability); *Gallagher v. Catto,* 778 F.Supp. 570 (D.D.C.1991) (plaintiff's self-initiated treatment, including the taking of leaves of absence and visits to counselors did not constitute a "handicapping condition"). At most, some of Defendant's employees knew that Plaintiff had some type of medical condition related to stress, but no one knew the details or the extent of Plaintiff's condition. Plaintiff never informed anyone that she suffered from a bipolar mood disorder. Plaintiff has

presented no evidence that anyone at Defendant knew that she had a bipolar mood disorder.

To expect Defendant to be on notice that Plaintiff suffered from a covered disability from the evidence she relies on is unreasonable. In his deposition, Plaintiff's family doctor, Dr. Cox, who was acutely aware that Plaintiff was having stress-related problems, testified that he was not aware that Plaintiff had bipolar mood disorder until he was informed specifically of that fact by Dr. Rivers–Bulkeley on January 28, 1993. Dr. Cox testified that although he had engaged in some study of psychiatric conditions, he found Plaintiff's condition to be "an enigma" and difficult for him to recognize.

In any event, it is undisputed that Plaintiff never communicated to Mr. Furman, who made the PIP decision, in any way about Plaintiff's medical condition. There is no evidence that Mr. Furman saw the two letters Plaintiff allegedly sent to Defendant. At best, the evidence permits a reasonable inference that Mr. Furman, and Mr. Timms and Mr. Phillips, for that matter, knew that Plaintiff had some type of stress-related medical condition. That alone is not sufficient to give notice of a covered disability for purposes of an ADA claim. *See Miller,* 61 F.3d at 630 (finding that employee's behaviors were not "so obviously manifestations of an underlying disability that it would be reasonable to infer that [her] employer knew of the disability," (quoting *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931–34 (7th Cir. 1995))).

Accordingly, the Court finds that Defendant did not discriminate against Plaintiff by giving Plaintiff a PIP because Plaintiff has presented no evidence that shows that Defendant knew Plaintiff had a disability at the time the decision was made to place Plaintiff on a PIP.[8]

---

**8.** Alternatively, as outlined below, the Court finds that even if the evidence creates a jury issue as to Defendant's notice of Plaintiff's known disability on February 23, 1993, when Defendant gave Plaintiff a performance improvement plan or PIP, Plaintiff has not presented evidence of a *prima facie* case of intentional discrimination in

placing her on a performance improvement plan, and, in any event, Defendant has shown legitimate non-discriminatory reasons for Plaintiff's February 23, 1993 performance evaluation, including the PIP. Plaintiff also has not shown Defendant's reasons for the PIP were a sham or pretext.

## C. Termination

Plaintiff further alleges that Defendant discriminated against her because of her disability when it terminated her employment after she took a second medical leave of absence in 1993. There is no evidence that Defendant knew of Plaintiff's bipolar mood disorder at the time of the February 23, 1993 performance evaluation. However, after that evaluation, Plaintiff took a second medical leave of absence and Defendant received additional information about Plaintiff's disability. Since factual issues exist about Defendant's knowledge of Plaintiff's disability at the time of termination, the Court assumes that Defendant knew of Plaintiff's bipolar mood disorder disability at the time of Plaintiff's termination on March 26, 1993.

 Intentional discrimination can be proved by either direct, statistical, or circumstantial evidence. Direct evidence, is that evidence which, if believed, "establishes discriminatory intent without inference or presumption." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir.1993). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark,* 990 F.2d at 1226; *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir. 1989). Evidence which only *"suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081–82 (11th Cir.1990) (emphasis in original). Here, Plaintiff presents no direct or statistical evidence of either disability or gender discrimination, but relies on circumstantial evidence.

In order to state a claim of intentional discrimination based on circumstantial evidence under the ADA, several courts have held that the *McDonnell Douglas/Burdine/St. Mary's* shifting burden analysis used in Title VII cases is applicable. *See DeLuca v. Winer Indus. Inc.,* 53 F.3d 793, 797 (4th Cir.1995); *Ennis v. National Ass'n of Bus. &*

*Educ. Radio, Inc.,* 53 F.3d 55, 57 (4th Cir. 1995). Also, the Eleventh Circuit has applied the Title VII analysis in both Section 1983 and age discrimination cases. *Burns v. Gadsden State Community College,* 908 F.2d 1512, 1518 n. 8 (11th Cir.1990).[9]

 Accordingly, to state a claim of intentional discrimination due to her disability based on circumstantial evidence, Plaintiff first must establish a *prima facie* case of disability discrimination by showing (a) that Plaintiff belongs to a protected class; (b) that Plaintiff was qualified for the position she held; (c) that Plaintiff was discharged and replaced by a person outside the protected class or that she was discharged while a person outside the protected class with equal or less qualifications, or with equal or more performance problems was retained. Next, the burden of production shifts to Defendant to offer legitimate non-discriminatory reasons for its conduct. Finally, the burden of production shifts back to Plaintiff, who must show that the reasons Defendant offered were mere pretext. Although the burden of production shifts, the burden of persuasion remains at all times with Plaintiff. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

 Even assuming Plaintiff presents a *prima facie* case of discrimination, Defendant articulates legitimate non-discriminatory reasons for its action. Defendant's written policy requires that all employees who take a medical leave of absence longer than four weeks be terminated. Defendant acted pursuant to this policy applicable to all employees, and did not act discriminatorily against Plaintiff when it terminated her position.

---

9. Also, other courts have held that the same analysis applies to claims brought under the Rehabilitation Act. *See Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994); *Barth v. Gelb,* 2 F.3d 1180, 1185–86 (D.C.Cir.1993); *Teahan v. Metro–North Commuter RR.,* 951 F.2d 511, 514 (2d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992); *Smith v. Barton,* 914 F.2d 1330, 1340 (9th Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991).

Defendant's medical leave of absence policy provides that any employee who takes a leave of absence of more than four weeks shall be terminated, as follows:

> The employee must request the medical leave of absence as far in advance as possible by submitting proper documentation form a physician and the reasons for the leave to his or her immediate manager. The Company will hold the employee's job for four (4) weeks. If the leave is longer than four weeks, the Company will use its best efforts to return the employee to active status. If no openings exist, however, the employee will be so informed and his/her employment with Zilog will be terminated.
>
> After an employee has been on a medical leave of absence for three (3) weeks, he or she will be sent a notification from Human Resources as a reminder of Zilog's right, per this procedure, to replace a person on medical leave after four (4) weeks.

Zilog Procedures Manual, Baumwell deposition, Exh. 30. On February 25, 1993, Plaintiff requested a medical leave of absence for a minimum of three months at which time her situation would be evaluated.

On March 19, 1993, pursuant to Defendant's policy, Plaintiff was sent a letter informing her of Defendant's right to terminate her employment after she had been on medical leave for four weeks. By March 26, 1993, Plaintiff had not indicated that she was going to return to work,[10] so Defendant sent Plaintiff a termination letter on a form provided by Defendant's policy. The letter terminated Plaintiff and stated: "At such time as your doctor provides you with a release to return to work, please notify the Human Resources Department of the date of your release. You will then be notified if a suitable opening is available at that time." Lewis deposition, Exh. 3. Thus, when Plaintiff's employment was terminated, she was still eligible to return to Zilog when she came off her leave of absence. Plaintiff has not

sought to return, but rather has applied for and been placed on long-term total disability status.

Considering the foregoing, the Court finds that Defendant articulates legitimate non-discriminatory reasons for its decision to terminate Plaintiff. Numerous courts have held that termination pursuant to a medical leave policy, when the employee does not return to work within the time required by the policy, is not discriminatory. *Harness v. Hartz Mountain Corp.*, 877 F.2d 1307 (6th Cir. 1989) (employer who terminated plaintiff when he did not return from sick leave within ninety days, as required by employer's written policy, did not violate state civil rights act), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 728, 107 L.Ed.2d 747 (1990); *Ulloa v. American Express Travel Related Serv.*, 822 F.Supp. 1566 (S.D.Fla.1993) (employer did not discriminate against plaintiff by terminating plaintiff after she failed to return from leave within twelve weeks, as required by company's written leave policy); *Mason v. Continental Ins. Co.*, 32 Fair Empl. Prac.Cases (BNA) 578, 1983 WL 523 (N.D.Ala.1983) (employer's action in discharging plaintiff where plaintiff violated company policy by taking more than 120 days for leave). Additionally, there is no evidence that Defendant's reasons are pretextual. Plaintiff presents no evidence that her disability contributed to the decision to terminate her, or that disabled individuals are treated differently from non-disabled employees pursuant to Defendant's policy. In fact, Defendant presents evidence that a number of other employees have been terminated pursuant to this medical leave policy, and that the policy has been applied consistently to disabled and non-disabled employees. Plaintiff has not shown that she is entitled to relief on her termination claim under the ADA.

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's ADA claims.

---

**10.** In fact, Dr. Cox wrote a note, dated March 12, 1993, stating:

> We have recommended Julie Lewis [sic] for a new job. Her present job situation has deteriorated to where it is probably not salvageable

and the stress has aggravated underlying emotional problems.

Lewis deposition, Exh. 2. This note was addressed "TO WHOM IT MAY CONCERN." It is unclear to whom it was sent.

## IV. *PLAINTIFF'S TITLE VII CLAIMS*

Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee because of the employee's gender. 42 U.S.C. § 2000e–2 (1994).[11] Plaintiff alleges that Defendant acted with gender-based invidiously discriminatory animus in violation of Title VII: (1) in placing Plaintiff on a PIP, what Plaintiff terms as probation; (2) by failing to promote Plaintiff to the position of Key Account Manager; (3) for not inviting Plaintiff to a training session for newly hired managerial employees; (4) in terminating Plaintiff's employment; (5) in retaliating against Plaintiff for contacting the EEOC; and (6) in creating a hostile work environment.

### A. *Performance Improvement Plan ("PIP")*

 As outlined in detail above, Defendant's policy provides that a performance improvement plan or PIP is given when an employee's performance is unsatisfactory. The written PIP informs the employee the things the employee must accomplish, and the deficiencies the employee must correct, or the employee no longer will be employed. While Plaintiff's gender discrimination claims are somewhat unclear, Plaintiff appears to contend that Plaintiff was given a PIP in part due to her gender, and that Plaintiff was treated differently and more harshly than males, such as Brady Williams.

 To establish a Title VII claim of gender discrimination based on circumstantial evidence, Plaintiff first must present a *prima facie* case of gender discrimination, which Defendant then can rebut by articulating a legitimate non-discriminatory reason for its conduct. Plaintiff then must demonstrate that Defendant's proffered reason is a mere pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981);

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hill v. Seaboard Coast Line R.R.*, 885 F.2d 804 (11th Cir.1989).

 To make a *prima facie* showing that Defendant acted with discriminatory intent when it placed Plaintiff on a PIP, Plaintiff must show (1) that she is a member of a protected class; (2) that her performance was not unsatisfactory and thus no PIP was required; and (3) that there is some causal connection between the issuance of the PIP and Plaintiff's gender, creating a jury issue whether Defendant acted with discriminatory intent.

As outlined in detail above, Plaintiff has admitted sufficient facts to show that Plaintiff's performance was unsatisfactory. Plaintiff admits to engaging in many of the behaviors criticized in her February 23, 1993 performance evaluation. Plaintiff does not dispute that she had a personality conflict with Brady Williams and that she was bitterly at odds with him. With respect to personality conflicts with individuals other than Mr. Williams, Plaintiff admits that she raises her voice when provoked. Plaintiff also acknowledges having a conflict with John Wynn, an ESI representative. However, Plaintiff states that it is widely known that Mr. Wynn often gets into shouting matches with Defendant's employees. Plaintiff further accedes to the statement of Mr. Phillips that she had been very confrontational and had contributed to making life difficult in Defendant's Georgia office. Specifically, Mr. Phillips stated that Plaintiff could not sabotage the whole organization and make the Georgia office nonfunctional because of her demands. Plaintiff responded by stating that Defendant should "get rid of" Brady Williams and that she had not invited Bob Mylacraine to work in the Georgia office.

Plaintiff contends that a jury issue exists whether her performance was satisfactory in January and February, 1993, especially given her track record of good performance re-

---

11. Title VII makes unlawful the discrimination by an employer against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2 (1994). Title VII does not proscribe disability discrimina- tion, nor does it give protected status to disabled persons. Therefore, the Court addresses only Plaintiff's gender discrimination claims under Title VII.

views and her December, 1992 evaluation, which Plaintiff contends was prepared in early 1993. Even so, Plaintiff nonetheless has admitted sufficient facts in January and February, 1993 to establish unsatisfactory performance as of the February 23, 1992 performance evaluation. Also, the Court finds that there is no evidence that Plaintiff was placed on a PIP because of her gender.

██ Even if Plaintiff presents a *prima facie* case of discrimination, Defendant articulates legitimate non-discriminatory reasons for its conduct. More importantly, Plaintiff presents no evidence of a causal connection between her PIP and her gender. Also, Plaintiff presents no evidence that Defendant's reasons are mere pretext.[12] Plaintiff offers only conclusory allegations that Defendant discriminated against her because of her gender. This is not sufficient to create a jury issue on the question of intentional discrimination. *See Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995) ("A jury question does not exist because of the presence of a 'mere scintilla of evidence'; rather, '[t]here must be a conflict in substantial evidence to create a jury question.'") (quoting *Verbraeken v. Westinghouse Electric Corp.*, 881 F.2d 1041 (11th Cir.1989) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969), *cert. dismissed*, 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990))). Accordingly, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's "PIP" claim under Title VII.

Alternatively, Plaintiff claims that even if her performance was unsatisfactory, she was disciplined and treated more harshly than males, like Brady Williams and Bob Mylacraine. According to Plaintiff, Brady Williams, when he was Plaintiff's supervisor, would leave the office to play golf and attend adult entertainment centers, and frequently not return customers' phone calls. On one occasion when she was out on sick leave, Plaintiff was called into the office to prepare some documents Mr. Williams was responsible for preparing.

According to Plaintiff, Bob Mylacraine often made obscene comments and displays a picture Plaintiff does not like near Bob Mylacraine's desk. Bob Mylacraine also left an unpleasant odor in the bathroom near Plaintiff's desk on one occasion. Plaintiff states that neither Brady Williams nor Bob Mylacraine was reprimanded their behaviors.

██ To establish a *prima facie* case of disparate treatment based on some disciplinary action, Plaintiff must show: (1) that she was a member of a protected class; (2) that she was similarly situated to individuals outside of the protected class; and (3) that she was denied a benefit or condition given to the similarly situated employees or disciplined more harshly than the similarly situated employees. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir.1989); *Thompkins v. Morris Brown College*, 752 F.2d 558, 562 (11th Cir.1985); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181 (11th Cir.1984). For Plaintiff and Brady Williams or Bob Mylacraine to be similarly situated, Plaintiff must show that the conduct Brady Williams and Bob Mylacraine engaged in was nearly identical to the conduct that resulted in Plaintiff's being given a PIP. *See Jones v. Gerwens*, 874 F.2d 1534 (11th Cir.1989); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181 (11th Cir.1984).

Accepting Plaintiff's allegations as true, Brady Williams abdicated some of his job responsibilities, and Bob Mylacraine was, at a minimum, offensive. However, Brady Williams's and Bob Mylacraine's behaviors were not nearly identical to, but instead materially different from Plaintiff's conduct. Plaintiff and Mr. Williams also were not similarly situated, as he was Plaintiff's supervisor at the time Plaintiff claims he abdicated some of his job responsibilities. Plaintiff has not met her burden of establishing a *prima facie* case of disparate treatment based on disciplinary action. Even if Plaintiff had established a *prima facie* case of disparate treatment, Defendant articulates legitimate non-

---

**12.** In fact, Mr. Timms, Plaintiff's supervisor, was subsequently placed on a PIP when his performance fell below expected levels.

discriminatory reasons for placing Plaintiff on a performance improvement plan and Plaintiff presents no evidence that Defendant's reasons are pretext.

### B. *Failure To Promote*

Plaintiff also contends Defendant failed to promote her to the position of Key Account Manager due to her gender. Plaintiff again relies on circumstantial evidence. In order to state a *prima facie* case of gender discrimination in failure to promote, Plaintiff must show (1) that she is a member of a protected class; (2) that she applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite her qualifications, she was rejected; and (4) that after her rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 536 (11th Cir.1992); *Harness v. Hartz Mountain Corp.,* 877 F.2d 1307 (6th Cir. 1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 728, 107 L.Ed.2d 747 (1990). The Key Account Manager position required either an Electrical Engineering degree or equivalent experience. Plaintiff had neither. Thus, Plaintiff's cannot show a *prima facie* case of discrimination because she was not qualified for the position. *See Hickerson v. Armour Food Co.,* 59 Fair Empl.Prac.Cases (BNA) 1615, 1992 WL 391165 (W.D.Ky.1992) (female employee did not establish *prima facie* case for failure to promote to microbiologist job, where she lacked the training and experience of the successful applicant); *Harris v. Norfolk S. Corp.,* 55 Fair Empl.Prac.Cases (BNA) 1540, 1990 WL 364776 (W.D.Va.1990) (plaintiff did not establish a *prima facie* case that she was unlawfully rejected for promotion where she was not qualified for the position because she did not have a masters degree or relevant experience); *EEOC v. Marion Motel Assoc.,* 763 F.Supp. 1334 (W.D.N.C.1991) (plaintiff who presented inconclusive evidence as to her qualifications for promotion failed to make out *prima facie* case), *aff'd,* 961 F.2d 211 (4th Cir.1992).

In addition, the individual hired into the position, Bob Mylacraine, had the requisite experience. Mr. Mylacraine had over ten years of directly relevant experience, having successfully worked with both Defendant's products and Defendant's major customers. Bob Mylacraine had managed a ten year plus Zilog relationship with Hayes Microcomputer Products dealing with technical design and sales; and had successfully won business from Northern Telecom. Mr. Mylacraine had established for Mr. Phillips a Zilog profile in engineering specification for remote control products and closed caption television products.

Although Plaintiff does not dispute Mr. Mylacraine's experience, Plaintiff counters that she was not told that relevant experience could qualify her for the position. Plaintiff was told only that the position required an Electrical Engineering degree. The fact that Plaintiff was not told that experience could qualify an individual for the position in lieu of a specific degree does not change the fact that to be qualified for the position, a person needed one or the other. Plaintiff had neither. Since Plaintiff was not qualified for the position she sought and Mr. Mylacraine was, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's "failure to promote" claim under Title VII.

### C. *Failure To Train*

Plaintiff claims Defendant did not invite Plaintiff to a training session in California for newly hired managerial employees because of her gender. To establish a *prima facie* case of disparate treatment based on conditions of employment, Plaintiff must show: (a) that Plaintiff is a member of a protected class; (b) that Plaintiff was entitled to or qualified for the desired terms and conditions of employment; (c) that Defendant denied Plaintiff the desired terms and conditions of employment; and (d) that nonprotected employees were granted the desired terms and conditions of employment. *Cf. Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1314 (11th Cir.1994).

Since Plaintiff was neither newly hired nor a managerial employee, Plaintiff was not eli-

gible to attend the training course for newly hired managerial employees. While Plaintiff would not have been automatically disqualified from attendance if there were openings and Plaintiff provided for her own travel accommodations, these were not the circumstances. Thus, Plaintiff cannot establish a *prima facie* case of discrimination.

Assuming *arguendo* Plaintiff could establish a *prima facie* case of discrimination, Defendant has presented legitimate non-discriminatory reasons for its actions. Mr. Mylacraine was a new manager who qualified for the orientation training. Plaintiff does not appear to dispute the propriety of Mr. Mylacraine's invitation to the orientation course, but Plaintiff contends that she too should have been included on the invitee list. When Plaintiff made known her desire to attend the training session, Plaintiff was placed on the list to be invited to the next orientation session, if reasonably possible. Defendant has presented legitimate non-discriminatory reasons for not inviting Plaintiff to the training session in California. Plaintiff has presented no evidence that Defendant's reasons are pretext. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 921 (11th Cir.1993); *Taylor v. Houston Lighting & Power,* 756 F.Supp. 297 (S.D.Tex.1990).

After reviewing the evidence in the record, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's "failure to train" claim under Title VII.

### D. *Termination*

For the same reasons discussed earlier regarding Plaintiff's termination claim under the ADA, the Court finds that Plaintiff has not shown that Defendant acted in a discriminatory fashion on the basis of Plaintiff's gender when Defendant terminated Plaintiff in accordance with Defendant's medical leave of absence policy. Assuming *arguendo* that Plaintiff can make a *prima facie* showing of gender discrimination based on her termination, the Court finds that Defendant's reliance on its medical leave of absence policy and on Plaintiff's representations that she was no longer willing to work in Defendant's Georgia office provide the legitimate non-discriminatory reasons neces-

sary to justify Defendant's terminating Plaintiff's employment and to rebut Plaintiff's *prima facie* case of discrimination. As discussed earlier, courts hold that termination pursuant to an employer's written leave plan, where the employee does not return to work within the time required by the plan, is not discriminatory. *Harness v. Hartz Mountain Corp.,* 877 F.2d 1307 (6th Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 728, 107 L.Ed.2d 747 (1990); *Ulloa v. American Express Travel Related Serv.,* 822 F.Supp. 1566 (S.D.Fla.1993); *Mason v. Continental Ins. Co.,* 32 Fair Empl.Prac.Cases (BNA) 578, 1983 WL 523 (N.D.Ala.1983). Additionally, Plaintiff presents no evidence that Defendant's reasons are mere pretext.

### E. *Plaintiff's Hostile Work Environment Claim*

In order to establish a hostile work environment claim, Plaintiff must show that the alleged conduct was so severe or pervasive that it created an abusive working environment and in fact affected her wellbeing in the workplace. *See, e.g., Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Sys., Inc.,* —— U.S. ——, —— ——, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1982); *Cummings v. Walsh Constr. Co.,* 561 F.Supp. 872, 876 (S.D.Ga.1983). The Court finds that Plaintiff cannot establish a *prima facie* claim of a hostile work environment on the facts here.

The conduct Plaintiff asserts created a hostile work environment falls below the severity necessary to establish a hostile work environment claim. Plaintiff cites the following as creating a hostile work environment: (1) a bathroom odor created by Mr. Mylacraine; (2) Mr. Mylacraine's displaying a picture of his body builder wife in a bikini; (3) Mr. Mylacraine's walking around with a hole in his trousers in the crotch area; and (4) Mr. Mylacraine's making a crude comment on the telephone. None of these acts, individually or taken together, rises to the level of creating an "objectively hostile or abusive work environment." *Harris,* —— U.S. at ——, 114 S.Ct. at 370.

In *Harris*, the Supreme Court enunciated four factors to be considered in determining whether a hostile work environment exists: (1) the frequency of the discriminatory conduct; (2) the severity of the discriminatory conduct; (3) whether the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the discriminatory conduct unreasonably interferes with an employee's work performance. *Harris,* —— U.S. at ——, 114 S.Ct. at 371.

The incidents here were all isolated occurrences; all were unremarkable; none of them was threatening or humiliating; and none of them should have impacted Plaintiff's work environment as a whole. The Supreme Court made clear in *Harris* that the " 'mere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. The Court finds that the incidents here, individually or taken together, do not meet the threshold for stating a hostile work environment claim under *Harris's* four factor test. Even if each incident were more offensive, the Court finds that the occurrences were too isolated to create an overall hostile work environment.

Defendant also argues that Plaintiff cannot meet *Harris's* subjective component. Defendant contends that Plaintiff admits frequenting nude clubs, watching pornographic films, and using offensive language herself. Accordingly, Defendant concludes that Plaintiff cannot show that she was subjectively offended by the incidents she cited. Since the Court finds that Plaintiff cannot establish *Harris's* objective component of a hostile work environment claim, the Court finds it unnecessary to address *Harris's* subjective component.

 Additionally, even if the above cited incidents were enough to establish a hostile work environment claim, Plaintiff still has not shown that Defendant was responsible for this "hostile work environment." An employer may only be held liable for the alleged improper conduct of its employee in the context of a hostile working environment claim if the employer "knew or should have known of the harassment and failed to take prompt reasonable action against the [employee]." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316, *reh'g denied,* 874 F.2d 821 (11th Cir.1989); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982). Thus, to establish a basis for Defendant's liability for her hostile work environment claim, Plaintiff must show "[t]he harassment was either actively or constructively known" by Defendant and that Defendant failed to take "prompt remedial action" to alleviate the problem. *Cummings v. Walsh Constr. Co.,* 561 F.Supp. 872, 877 (S.D.Ga.1983); *see also Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 404 (5th Cir.1993) (upholding grant of summary judgment to employer where no evidence that the employer knew or should have known of the alleged harassment).

Plaintiff complained to only Mr. Timms about two of the incidents Plaintiff now cites as creating the hostile work environment, i.e., the bathroom odor and the telephone comment. Mr. Timms spoke to the co-worker about the bathroom incident and reprimanded the co-worker about the telephone comment. Plaintiff has presented no evidence, and does not allege, that she complained about the other two incidents. Thus, Defendant responded to two incidents and was unaware of the other two incidents. For all of the above reasons, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claim.

**F. *Retaliation***

 Plaintiff also claims that Defendant retaliated against her for contacting the EEOC regarding Defendant's alleged discriminatory practices based on Plaintiff's gender and disability. To establish a claim of retaliation under Title VII, 42 U.S.C. § 2000e–3 (1994), a plaintiff need not prove the underlying claim of discrimination. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989). To establish a *prima facie* case for retaliatory discharge under Title VII, Plaintiff must show (1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action subsequent to this opposition; and (3) there was a causal

link between the protected opposition and the adverse employment action. *Id.* Plaintiff has not shown the third element of her *prima facie* case; namely the causal link between Plaintiff's contacting the EEOC and Defendant's taking an adverse action against her. "In a retaliation case, the plaintiff bears the burden of showing that the defendant intended to retaliate when it took the actions complained of, and there can be no retaliatory intent unless there is knowledge that the plaintiff has, in fact, filed charges." *Downey v. Isaac,* 622 F.Supp. 1125, 1132 (D.D.C.1985), *aff'd,* 794 F.2d 753 (D.C.Cir. 1986); *see also EEOC v. Reichhold Chem. Inc.,* 988 F.2d 1564, *reh'g denied,* 996 F.2d 316 (11th Cir.1993); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1524 (11th Cir.1991); *Smith v. State of Georgia,* 684 F.2d 729, 730 (11th Cir.1982); *DeAnda v. St. Joseph Hosp.,* 671 F.2d 850, 856 (5th Cir.1982).

Plaintiff complains that Defendant unlawfully retaliated against her for contacting the EEOC when Defendant gave her the PIP review pursuant to its written policy and when Defendant terminated her pursuant to its leave of absence policy when she failed to return after four weeks. Plaintiff cannot establish that either of these actions were retaliatory because there is no evidence that the individuals responsible for making those decisions were aware that Plaintiff had contacted the EEOC.[13] In her Statement of Facts, Plaintiff states only that she contacted the EEOC on or about January 29, 1993, and that she informed Mr. Timms of that fact sometime in late January or February.[14] Accepting this as true, Plaintiff can point only to evidence that Mr. Timms knew that she visited the EEOC, and not Mr. Furman or Mr. Phillips. Further, Plaintiff admits that Mr. Timms did not even see the PIP that Plaintiff claims was a result of discrimination until the night before it was presented to Plaintiff. Therefore, the Court finds that Plaintiff cannot establish a *prima facie* show-

ing of discrimination on her retaliation charge.

Assuming *arguendo* Plaintiff can make a *prima facie* showing of retaliation, Defendant has presented legitimate non-discriminatory reasons for its actions. Defendant's written policy provided that Defendant was required to give Plaintiff a PIP review. Additionally, Defendant also has a written policy requiring employees who take more than a four weeks leave of absence to be terminated. Thus, Defendant has presented evidence that neither of the actions of which Plaintiff complains was the result of discriminatory animus. Plaintiff has presented no evidence showing that Defendant's reasons are pretext. Under Title VII, an employee may be disciplined or terminated "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984).

Accordingly, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim.

## V. *PLAINTIFF'S OBJECTIONS TO DECLARATIONS OF MIKE FURMAN AND SALLY BAUMWELL*

In a Declaration filed with Defendant's Reply Brief in Support of its Motion for Summary Judgment, Mike Furman declared that he was not aware that Plaintiff had a disability at the time he made the decision to give Plaintiff a performance evaluation and PIP. On December 19, 1994, Plaintiff filed an Objection to the Submission and Consideration of Defendant's Inadmissible and Improper Evidence [54–1], arguing that the Furman Declaration is inadmissible evidence because it was not sworn before a notary public or some other public official.

---

13. Plaintiff claims she told Sally Baumwell that Plaintiff had spoken with the EEOC. Even if Plaintiff informed Ms. Baumwell that Plaintiff contacted the EEOC, there is no evidence that Mr. Furman or Mr. Phillips, the individuals responsible for making the decisions about which Plaintiff complains, knew that Plaintiff contacted the EEOC.

14. Plaintiff did not file discrimination charges at this time, but only contacted the EEOC. Additionally, Plaintiff also alleges that she told Ms. Baumwell and Mr. Mylacraine that she visited the EEOC.

Plaintiff's first contention is without merit. Section 1746 of Title 28 of the United States Code provides that any matter required or permitted to be supported by affidavit may, with like force and effect, be supported by an unsworn declaration so long as the party making the declaration states: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on [date]." 28 U.S.C. § 1746 (1994). The Furman Declaration complies with this requirement.

 Plaintiff's second argument that the Furman Declaration is untimely filed has merit. The Furman Declaration was not submitted with Defendant's original Motion for Summary Judgment, but only with Defendant's Reply Brief. Since the Local Rules do not allow Plaintiff to respond to Defendant's Reply Brief, Plaintiff does not have an opportunity to respond to this "new" evidence. Accordingly, the Court sustains Plaintiff's Objection to the admissibility of the Furman Declaration.

In her Objection, Plaintiff also objects to the admissibility of the Declaration of Sally Baumwell because it was an unsworn declaration. Pursuant to 28 U.S.C. § 1746, the Court finds that the Baumwell Declaration was submitted with Defendant's initial Motion and is admissible in support of Defendant's Motion for Summary Judgment. Thus, the Court overrules Plaintiff's Objection to the admissibility of the Baumwell Declaration.

## VI. *CONCLUSION*

In conclusion, the Court GRANTS Defendant's Motion for Summary Judgment [37–1] on all of Plaintiff's claims.

The Court GRANTS Defendant's Motion to Amend Summary Judgment Papers to Correct Proofing Errors [39–1]. The Court GRANTS Defendant's Motion to Extend Plaintiff's Time to Respond to Defendant's Motion for Summary Judgment [39–2]. The Court GRANTS Plaintiff's Motion for Leave to File Statement of Issues and Citations [45–1]. The Court SUSTAINS in PART and OVERRULES in PART Plaintiff's Objection to the Submission and Consideration of Defendant's Inadmissible and Improper Evidence [54–1]. The Court SUSTAINS Plaintiff's Objection to the admissibility of the Furman Declaration, and the COURT OVERRULES Plaintiff's Objection to the Baumwell Declaration. The Court GRANTS Defendant's Motion for Leave to Supplement Citation of Authority in Support of Motion for Summary Judgment [56–1]. The Court GRANTS Defendant's Second Motion for Leave to Supplement Citation of Authority in Support of Motion for Summary Judgment [61–1].

The Clerk is directed to enter final judgment in favor of Defendant on all Plaintiff's claims.

It is SO ORDERED.