**Bill HARNESS, Plaintiff–Appellant,**

v.

**HARTZ MOUNTAIN CORP.,
Defendant–Appellee.**

No. 88–5791.

United States Court of Appeals,
Sixth Circuit.

Argued March 21, 1989.

Decided June 27, 1989.

Rehearing and Rehearing En Banc
Denied Aug. 10, 1989.

---

Sam Hayward, Philip C. Kimball (argued), Louisville, Ky., for plaintiff-appellant.

Ronald D. Ray, Robert H. Keats, Frank P. Hilliard (argued), Louisville, Ky., for defendant-appellee.

Before KRUPANSKY and NELSON, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This reverse discrimination case involves an interpretation of Kentucky's statutory counterpart to the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and the Kentucky statute's application to the pregnancy leave policy of Hartz Mountain Corporation (Hartz). Harness contends that Hartz' policy discriminates in favor of pregnant employees and against male employees. We believe that the Supreme Court's opinion in *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987), permits the favorable treatment accorded pregnant employees by the Hartz policy. Accordingly, we affirm the district court's grant of summary judgment in Hartz' favor.

## FACTS

Bill Harness was employed by Household Research Institute (HRI) in July of 1972. In 1986, HRI was purchased by Hartz and on March 1, 1986, Harness became an employee of Hartz.

On June 6, 1986, Hartz was informed that Harness had suffered a heart attack and would require a leave of absence. Hartz placed Harness on unpaid leave on June 9, 1986, pursuant to the following policy applicable to non-union employees such as Harness:

If your leave is for illness or non-work related injury, you are eligible for a thirty (30) day leave. If you are unable to return after the first 30–day leave, you may request an extension, in writing, with a doctor's note attached indicating your return to work date. If you are unable to return after 60–days (original leave plus 30–day extension), you may request another 30–day extension, in writing, with another doctor's note attached indicating your return to work date. If you cannot return after the aforementioned 90–days, you will be considered to have resigned your position because of illness.

Shortly after he was placed on unpaid leave, Harness was sent a copy of this policy by Hartz along with an acknowledgment form, which Harness signed on June 23, 1986, stating: "I have received your letter regarding the Company's Leave of Absence procedures and agree to abide by them. I understand that failure to follow these procedures will result in my voluntary resignation."

Harness was granted the two 30–day extensions allowed in the policy. The maximum 90–day period of unpaid leave expired on September 9, 1986. Since Harness was unable to return to work at that time due to his continued illness, Hartz considered him to have resigned as of September 9, 1986.

The next month, Harness obtained a statement from his treating physician advising that Harness could return to work on October 14, 1986, 125 days from the day his unpaid leave began. Hartz abided by its policy and refused to reinstate Harness.

On August 6, 1987, Harness filed suit against Hartz in Jefferson Circuit Court alleging reverse discrimination in violation of KRS §§ 344.030(6) and 344.040(1). Harness contended that a provision in Hartz' leave policy accorded more favorable treatment to pregnant employees and thus discriminated against male employees. That policy provision states:

If your leave is for maternity related reasons, you are entitled to a 90–day leave to be used before and after the date of delivery. This type of leave may be extended up to one (1) year, provided

a written request is made each sixty (60) days.

At the request of Hartz, the suit was removed to federal district court on October 1, 1987, on the basis of diversity of citizenship. After stipulating to the facts, both parties moved for summary judgment. On June 20, 1988, the district court granted summary judgment in favor of Hartz. Harness now appeals to this court.

## ANALYSIS

In 1980, Kentucky enacted its counterpart to Title VII's Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k). The PDA is a definitional amendment to Title VII which was added in 1978 to "clarif[y] that the prohibitions against sex discrimination in the act include discrimination in employment based on pregnancy, childbirth, or related medical conditions." H.R. Rep. No. 95–948, 95th Cong., 2d Sess. 1, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4749, 4749. The Kentucky statute, KRS § 344.030(6), mirrors, word-for-word, the pertinent definitional language of the PDA. KRS § 344.030(6) provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in this section shall be interpreted to permit otherwise.

Harness contends that by virtue of the definition of sex discrimination in KRS § 344.030(6), he was discriminated against under KRS § 344.040(1) which provides:

> It is an unlawful practice for an employer:
>
> (1) To fail or refuse to hire, or to discharge any individual, or otherwise to

discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, or age between forty (40) and seventy (70)

. . . .

The pregnancy leave policy of Hartz, Harness asserts, does not treat pregnant and non-pregnant employees the same and thus discriminates against male employees on the basis of sex, i.e., on the basis of pregnancy.

As there are no dispositive Kentucky court decisions interpreting KRS § 344.030(6) as it applies to KRS § 344.040(1), we must turn to the federal court decisions interpreting the PDA to decide this case. *Irvin v. Airco Carbide*, 837 F.2d 724, 726 n. 1 (6th Cir.1987) ("The cases construing Title VII are applicable in determining discrimination under the Kentucky Civil Rights statute, Ky.Rev.Stat. § 344.040 (1983)."); *Kentucky Comm'n on Human Rights v. Commonwealth*, 586 S.W.2d 270, 271 (Ky.Ct.App.1979) ("The Kentucky statute [KRS § 344.040] is virtually identical to the corresponding section of the U.S. Civil Rights Act of 1964, codified in 42 U.S.C. § 2000e–2(a). Therefore, United States Supreme Court decisions regarding the federal provisions are most persuasive, if not controlling, in interpreting the Kentucky statute. *Kentucky Com'n v. Com., Dept. for Human Resources*, Ky.App., 564 S.W.2d 38 (1978).").[1] *See also* KRS § 344.020(1) ("The general purposes of this chapter are: (a) To provide for execution within the state of the policies embodied in the Federal Civil Rights Act of 1964. . . ."); *Evans v. General Tire and Rubber Co.*, 662 S.W.2d 843 (Ky.Ct. App.1983); *Kentucky Comm'n on Human Rights v. Kerns Bakery, Inc.*, 644 S.W.2d 350 (Ky.Ct.App.1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983).

**1.** Not only is a decision by the Supreme Court of the United States interpreting the federal statute "most persuasive . . . in interpreting the Kentucky statute," it should also be noted that the decision in the district court in this case was made by Hon. Thomas A. Ballantine, Jr., who

was a state circuit judge for thirteen years before he became a federal district judge in 1979. We should give great weight to this district judge's determination of state law. C. Wright, Law of Federal Courts § 58 (1976).

The Supreme Court in *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987), held that the PDA did not preempt a California statute which provided for up to four months of unpaid pregnancy disability leave and did not require similar leave for other disabled employees. The Court concluded that the PDA permitted some preferential treatment of pregnant employees. "Accordingly, subject to certain limitations, we agree with the Court of Appeals' conclusion that Congress intended the PDA to be 'a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise.' 758 F.2d, [390] at 396." *Id.* 479 U.S. at 285, 107 S.Ct. at 692 (footnote omitted). After reviewing the legislative history of the PDA, the Court noted: "It is hardly conceivable that Congress would have extensively discussed only its intent not to require preferential treatment if in fact it had intended to prohibit such treatment." *Id.* at 287, 107 S.Ct. at 693.

In the present case, the pregnancy leave policy of Hartz gives preferential treatment to pregnant employees. Such employees are permitted to take up to one year of unpaid leave for "maternity related reasons." Other employees, such as Harness, are allowed only 90 days of unpaid sick leave. Since the *Guerra* Court held, however, that such preferential treatment is permissible under the PDA, it follows that the preferential treatment accorded pregnant employees under the Hartz policy is permissible under KRS §§ 344.030(6) and 344.040(1). *See Kentucky Comm'n on Human Rights*, 586 S.W.2d at 271. We conclude that the Hartz policy did not effect discriminatory treatment of Harness in violation of the applicable Kentucky statutes.

We therefore AFFIRM the district court's grant of summary judgment in favor of Hartz Mountain Corporation.

DAVID A. NELSON, Circuit Judge, dissenting.

I should like to concur, but the unambiguous language of the Kentucky statute makes it difficult for me to do so.

Hartz Mountain's leave policy, as the court's opinion acknowledges, unquestionably discriminates in favor of pregnant employees. This is discrimination "because of sex," within the meaning of those words as used in the Kentucky statute, because the statute explicitly says so: "The terms 'because of sex' or 'on the basis of sex' include ... because of or on the basis of pregnancy, childbirth, or related medical conditions...." KRS § 344.030(6).

In a world governed by common sense, one might suppose, employers would not only be free to discriminate in favor of women because of pregnancy, they would be encouraged to do so. Under KRS § 344.030(6), however, pregnant women must be treated "the same" as people who are not pregnant. Under KRS § 344.040(2), "[i]t is an unlawful practice for an employer ... [to] classify his employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex"—and "sex," in this context, includes pregnancy. Under KRS § 344.040(1), similarly, it is an unlawful practice for an employer "to discharge any individual or otherwise to discriminate against an individual" because of such individual's sex. Sex, again, includes pregnancy, because KRS § 344.030(6) says it does.

These provisions would seem, on their face, to tell employers "treat pregnant employees the same as anyone else. Do not classify your employees in any way which would adversely affect anyone's status as an employee on the basis of pregnancy, childbirth, or related medical conditions—*i.e.*, on the basis of sex—and do not discharge anyone pursuant to such a classification."

The language of KRS § 344.030(6) seems plain enough: "[W]omen affected by pregnancy, childbirth, or related medical conditions *shall be treated the same* for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work, and *nothing in*

*this section shall be interpreted to permit otherwise.*" (Emphasis supplied.) As Justice White said of the identical provision in the federal statute on which the Kentucky legislation was patterned, the provision "could not be clearer: it mandates that pregnant employees 'shall be treated the same for all employment-related purposes' as nonpregnant employees similarly situated with respect to their ability or inability to work. This language leaves no room for preferential treatment of pregnant workers." *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 297, 107 S.Ct. 683, 698, 93 L.Ed.2d 613 (1987) (White, J., dissenting).

The plaintiff in the case at bar says that pregnant women are not treated "the same" at Hartz Mountain. He says that they are treated differently from men, such as himself, who are similar in their inability to work. And he says that if he had been treated the same as a pregnant woman, he would not have been discharged three months after his leave began.

The plaintiff is, of course, correct. Pregnant women are not treated the same at Hartz Mountain, they are treated differently. Notwithstanding KRS §§ 344.030(6) and 344.040(2), Hartz Mountain unquestionably classifies its employees two different ways for medical leave purposes: employees taking leave because of pregnancy and childbirth come under one classification, and employees taking leave because of any other medical condition come under a second. Employees in the first classification can have their leave extended for up to one year, but employees in the second classification are automatically discharged if they cannot return to work after 90 days.

Such a classification would be unexceptionable if the criteria on which it is based —pregnancy and childbirth—had not been equated with "sex," a forbidden criterion. The statute would obviously allow an employer to adopt a classification system under which cancer patients, for example, could take leave for up to one year, while everyone else would be discharged for exceeding a 90–day limit. But the statute does not permit an employer to tell cancer patients that they may take leave for up to one year if they are women, and will be discharged after 90 days if they are men. That is discrimination on the basis of sex, and the statute prohibits it. Discrimination on the basis of pregnancy is sex-based discrimination too, the Kentucky legislature having said so in the plainest of terms, and the victim of such discrimination is no less entitled to redress, as far as the language of the statute is concerned, than the victim of any other type of discrimination:

"*Any* person deeming himself injured by *any* act in violation of the provisions of this chapter shall have a civil cause of action in circuit court to enjoin further violations, and to recover the actual damages sustained by him...." KRS § 344.450 (emphasis supplied).

This provision contains no exception for acts of discrimination deemed by statute to be based on sex.

It is true that in *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, a majority of the Supreme Court, speaking of the federal counterpart of the Kentucky statute, expressed the view that if Congress had intended to prohibit preferential treatment for pregnant women, it would have said so in the legislative history. *Id.* at 287, 107 S.Ct. at 693. Unable to find any manifestation of such an intent in the legislative history, and citing the "familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers," *id.* at 284, 107 S.Ct. at 691 (quoting *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), as quoted in *Steelworkers v. Weber,* 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979)), the Court concluded that the federal statute was not intended to mean what it appears literally to say. Justice Stevens, concurring in *Guerra,* noted that although the plain language of the statute points to neutrality, there is no persuasive evidence "that Congress considered the ramifications of a rule mandating complete neutrality." *Id.* at 293 n. 2, 107 S.Ct. at 696 n. 2.

As to the case at bar, I am aware of no persuasive evidence that the Kentucky legislature considered the ramifications of the "complete neutrality" rule embodied in the Kentucky statute. It is entirely possible—and perhaps it is probable—that if the legislature had considered the ramifications of what it was doing, it would have done something different. *Guerra* would seem to teach that judges need not follow the mandate expressed in the statute, under such circumstances, and may take the action they believe the legislature would have taken if the legislature had thought more carefully about what it was doing.

That sort of approach—a tempting one, as I can attest, see *Asphalt Products Co. v. Commissioner of Internal Revenue*, 482 U.S. 117, 107 S.Ct. 2275, 96 L.Ed.2d 97 (1987) (per curiam)—does have its critics. In *The Nature of the Judicial Process*, Benjamin Cardozo, expressing himself with uncharacteristic bluntness, wrote that

> "Judges have, of course, the power, though not the right, to ignore the mandate of a statute, and render judgment in despite of it. They have the power, though not the right, to travel beyond the walls of the interstices, the bounds set to judicial innovation by precedent and custom. None the less, by that abuse of power, they violate the law." *Id.* at 129.

Chief Justice Burger, after quoting a later passage from the same chapter of Cardozo's book, put the point thus in his *Weber* dissent:

> "What Cardozo tells us is beware the 'good result,' achieved by judicially unauthorized or intellectually dishonest means on the appealing notion that the desirable ends justify the improper judicial means. For there is always the danger that the seeds of precedent sown by good men for the best of motives will yield a rich harvest of unprincipled acts of others also aiming at 'good ends.'" *Steelworkers v. Weber*, 443 U.S. at 219, 99 S.Ct. at 2735 (Burger, C.J., dissenting).

If judges can amend the text of a statute because it produces consequences probably not foreseen by its makers, will not much of the legislation now on the books be found subject to revision in the courts? And how, except through the actual words of the legislature, can any judge be sure that results which may strike the judicial mind as undesirable were not in fact foreseen by the persons who drafted the statute, if not by the legislators who voted for it? [1] And if judges could somehow know what was or was not in the mind of every legislator who voted for passage, how can it possibly be known what the legislature would have done had its members been better informed? These are only a few of the questions raised by the *Guerra* approach, but perhaps they will suffice to suggest that *Guerra* is not without its problems. It is certainly not a foregone conclusion, in my view, that a state court in Kentucky would choose to follow the majority opinion in *Guerra*, rather than following the dissent, in a situation where *Guerra* does not constitute a legally binding precedent.

*Guerra* is not binding here as a matter of federal law, of course. The federal courts have jurisdiction over this case only because the parties are citizens of different states, and the law we are to apply in interpreting the Kentucky statute is the law of Kentucky, not the law of the United States. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

I do not doubt that the Kentucky courts would treat *Guerra* as a most persuasive authority, in light of the fact that the Kentucky statute was copied from the federal statute. *Guerra* was not decided until well after the enactment of the Kentucky statute, however (the statute was passed in 1980 and *Guerra* was not decided until 1987), and in such a circumstance I know of no Kentucky law requiring that the federal precedent be followed willy-nilly.

**1.** The problem is compounded here, of course, where the Kentucky statute was copied almost verbatim from the federal statute. If the federal statute had a narrower scope than its language indicates, how can we know that the Kentucky legislature was cognizant of that fact, the Supreme Court not having spoken to the point when Kentucky adopted the statute?

If the Kentucky courts were persuaded that the federal courts erred in *Guerra*—and judges from Kentucky are notoriously independent, as the first Mr. Justice Harlan demonstrated most conspicuously, perhaps, in *Plessy v. Ferguson*, 163 U.S. 537, 552, 16 S.Ct. 1138, 1143, 41 L.Ed. 256 (1896)—I assume that the Kentucky courts would not wish to make a similar error in applying the Kentucky statute. Among the general purposes of the Kentucky legislature, after all, was the purpose of safeguarding "all" individuals within the state from discrimination because of "sex," in the statutory sense. KRS § 344.020(1)(b). It was also the purpose of the Kentucky legislature to "provide for execution within the state of the policies embodied in the federal Civil Rights Act of 1964 as amended...." As far as pregnancy is concerned, the policies "embodied" in the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, can only have been the policies embodied in the statute Congress actually passed in 1978. Arguably, at least, those policies are not identical in all respects to the policies endorsed by a bare majority of the United States Supreme Court in 1987.

Kentucky courts try to give effect to the plain words of Kentucky statutes if the words are unambiguous, *Coomer v. Gray*, 750 S.W.2d 424, 425 (Ky.1988), unless the plain meaning would "lead to an absurd or wholly unreasonable conclusion." *Bailey v. Reeves*, 662 S.W.2d 832, 834 (Ky.1984). *Cf. Board of Education v. Logan Aluminum, Inc.*, 764 S.W.2d 75 (Ky.1989). No one has seriously urged that the plain words of the statute before us in this case are ambiguous, so we are left with the question whether the results to which they point are "absurd" or "wholly unreasonable."

Thirty or forty years ago, perhaps, this might have been considered an easy question. I do not consider it so today. We have witnessed something of a social revolution in the past few decades, and while those of us who were not active participants may find it difficult to gauge the extent of the changes the revolution has wrought, we cannot simply ignore them.

If I feel strongly that employers ought to be left free to extend preferential treatment to pregnant workers, that does not necessarily mean that the Kentucky legislature failed to understand what it was doing when it said—as it did say—that a woman who cannot work because of pregnancy or childbirth "shall be treated the same" as a person who cannot work because he or she is recuperating from a heart attack, for example.

It was urged on the *Guerra* Court with "conviction," according to Justice White, "that preferential treatment represents a resurgence of the 19th-century protective legislation which perpetuated sex-role stereotypes and which impeded women in their efforts to take their rightful place in the workplace." 479 U.S. at 300, 107 S.Ct. at 699. Could a Kentucky judge who disagreed with that view hold, in good conscience, that it is "absurd" or "wholly unreasonable?" Probably not.

When in doubt, I believe, the better course is to take the legislature at its word and apply the statute as written. If the legislature finds that it has made a mistake, or that the voters do not like some of the ramifications of what the statute says, the statute can always be changed—by the legislature. Thus when Congress realized, as it did after the Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that the earlier version of the Civil Rights Act of 1964 did not say what many Members would have preferred that it say, Congress responded by enacting the Pregnancy Discrimination Act of 1978. And if the Kentucky legislature should come to realize, as a result of a court decision, that a statute requiring pregnant women to be treated "the same" goes further than the legislators, on reflection, consider wise, I do not doubt that the legislature would change the statute. Kentucky legislators get paid for that sort of thing. Kentucky judges do not.

This is a difficult case, but I am inclined to believe that a Kentucky judge who thought the matter through carefully, without losing sight of the courts' assigned

role, would decide that the Kentucky statute must be applied as written. My colleagues having seen the matter differently, I respectfully dissent.