Tori **MULLET**, Plaintiff,

v.

**WAYNE–DALTON CORP.**, Defendant.

No. 5:03CV2485.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 27, 2004.

Jennifer D. Matyac, Medina, OH, Sally D. Henning, Canton, OH, Stephen J. Brown, Medina, OH, for Plaintiff.

Christopher J. Freeman, Medina, OH, for Defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court are fully briefed cross-motions for summary judgment (Doc. Nos. 20, 34).[1] For the reasons set forth below, plaintiff's motion (Doc. No. 34) is denied and defendant's motion (Doc. No. 20) is granted with respect to plaintiff's federal and state law claims of pregnancy discrimination. Plaintiff's remaining state law claims are dismissed without prejudice.

## I. BACKGROUND

On December 5, 2003, plaintiff, Tori Mullet filed this action against her former employer, Wayne–Dalton Corp., alleging that her employment had been terminated on or about June 9, 2003 in violation of the Pregnancy Discrimination Act.[2] The complaint, as amended (Doc. No. 18), sets forth four causes of action: (1) sex/pregnancy discrimination under Title VII; (2) sex/pregnancy discrimination under Ohio Rev.Code Chapter 4112; (3) a state law public policy tort; and (4) a state law claim of infliction of emotional distress. *See* Doc. No. 18. None of the material facts are in dispute.

Defendant is in the business of manufacturing garage doors and garage door components. At the time of plaintiff's employment, defendant employed about 500 people at the Mt. Hope, Ohio facility where plaintiff worked.

Plaintiff was hired by defendant on June 17, 2002 for the position of Hardware Assembler C. She was not covered by any collective bargaining agreement and her employment was at-will. Her job duties required that she occasionally lift boxes of bolts, brackets and bearings weighing in excess of 40 pounds.

Beginning on or about April 21, 2003, defendant began requiring employees on one of its several production lines to work 10-hour shifts in order to accommodate customer demand for its product. It was the defendant's policy that any employee scheduled to work any shift over 8 hours was required to work the shift unless the employee had vacation time and/or other authorized leave that would excuse the employee's attendance (and then only if the leave was properly sought and granted by a supervisor). Failure to work a scheduled overtime shift would subject the employee to discipline.[3] Plaintiff had worked several of these 10-hour shifts.

On or about May 8, 2003, plaintiff presented defendant with a doctor's note dated that same day indicating that she was pregnant and due to deliver around August 23, 2003. The note stated that plaintiff "has gestational diabetes and threatened preterm labor." The slip also said that she "should be off work probably until at least 6 weeks post partum." (Compl.,

---

1. Plaintiff's original motion for partial summary judgment (Doc. No. 28), which was amended by Doc. No. 34, is denied as moot for record purposes.

2. Plaintiff exhausted her administrative remedies and received a right to sue letter from the EEOC.

3. Wayne–Dalton had a discipline policy which assigned points to certain employee behaviors. If a person accumulated six (6) points, the person's employment was terminated.

Exh. E).[4] On May 8, 2003, plaintiff requested a 30–day personal leave of absence based on her doctor's note. At that time, plaintiff had not yet worked for Wayne–Dalton for a full 12 months and was not eligible for leave under the Family and Medical Leave Act ("FMLA"). On May 9, 2003, she submitted a "Personal Leave of Absence Request" form, requesting a leave from May 9, 2003 to June 7, 2003. The request form specifically provided: "I understand [that] if I fail to return to work, full-duty, within 30 days, my employment with Wayne–Dalton, will be terminated." Defendant approved the requested personal leave.

On or about June 5, 2003, just as her approved leave was nearing completion, plaintiff's doctor faxed defendant another note dated June 2, 2003. This note stated that plaintiff "[m]ay return to work 6–9–03," and that her "workday is restricted to [no more than] 8 hrs/day and lifting [is] restricted to [no more than] 20 lbs. on an occasional basis."

On June 6, 2003, defendant's employees, Chad Luxenburg, Scott Harmon and Jacqueline Clausnitzer, called plaintiff at her residence to inquire whether she would be reporting back to work on June 9, 2003. She confirmed that she would return, but subject to the restrictions placed on her by her doctor. Wayne–Dalton informed her that, because she was unable to return to "full duty" for her Hardware Assembler C position, she could not return, but would be terminated.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled

to judgment as a matter of law. Fed. R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). *See, e.g., U.S. v. Hodges X–Ray, Inc.,* 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves . . . ." *Celotex Corp. v. Catrett,* 477

---

4. All citations to the "Complaint" are actually citations to the Second Amended Complaint.

(Doc. No. 18).

U.S. at 324, 106 S.Ct. 2548. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548 (equating the standard for judgment as a matter of law under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*) and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. *See also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir.2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

## III. DISCUSSION

### A. Applicable Law

Title VII of the Civil Rights Act of 1964 prohibits discrimination "because of ...

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). In 1978, after the Supreme Court held in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that Title VII did not prohibit discrimination because of pregnancy, Congress responded with the Pregnancy Discrimination Act ("the PDA"), amending Title VII to include discrimination on the basis of pregnancy within the category of unlawful gender discrimination. *Ensley–Gaines v. Runyon*, 100 F.3d 1220, 1223–24 (6th Cir.1996). The PDA provided that the terms "because of sex" or "on the basis of sex" in Title VII shall include "on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. § 2000e(k).[5]

■ Employers are not required to treat pregnant employees in any special way. Rather, such employees must be treated the same as other employees on the basis of their "ability or inability to work." *Ensley–Gaines*, 100 F.3d at 1226, citing 42 U.S.C. § 2000e(k).[6]

■ The PDA protects a pregnant woman's right to remain in the work place, that is, it "protect[s] female workers from being treated differently from other employees simply because of their capacity to bear children." *International Union v. Johnson Controls, Inc.*, 499 U.S. 187, 205, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). However, preferential treatment of pregnant employees is not required by the PDA.[7] In fact, "the language of the statute simply does not address the right of a pregnant employee, fully able to work, to receive benefits that are different from, and arguably superior to, the benefits available to other employees." *Armstrong*

5. The EEOC's Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.10(b), which are not binding but only persuasive, provide as follows:

> Disabilities caused or contributed to by pregnancy, childbirth, or related medical conditions, for all job related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions, under any health or disability insurance or sick leave plan available in connection with employment. Written or unwritten employment policies and practices involving matters such as ... payment under any health or disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy, childbirth, or related medical conditions on the same terms and conditions as they are applied to other disabilities....

6. This section of Title VII provides:

> (k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as

other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

7. Interestingly, although the PDA neither allows employers to deny pregnant employees benefits given to other employees nor requires them to give special treatment, an employer may *choose* to give preferential treatment to pregnant employees, without giving the same preferential treatment to other employees. As the Supreme Court has indicated, "Congress intended the PDA to be a floor beneath which pregnancy disability benefits may not drop— not a ceiling above which they may not rise." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 285, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *see also Harness v. Hartz Mountain Corp.*, 877 F.2d 1307, 1310 (6th Cir. 1989).

*v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1316 (11th Cir.1994).

> Under [the PDA], the treatment of pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.

*Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 646 (8th Cir.1987) (quoting S.Rep.No. 95–331, 95th Cong., 1st Sess. 3–4 (1977)).

> The [PDA] does not, despite the urgings of feminist scholars, require employers to offer maternity leave or take other steps to make it easier for pregnant women to work—to make it as easy, say, as it is for their spouses to continue working during pregnancy."

*Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir.1994) (also observing that "[e]mployers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees"); *see also, Daugherty v. Genesis Health Ventures of Salisbury, Inc.*, 316 F.Supp.2d 262, 265 n. 3 (D.Md.2004) (observing that a policy affording light-duty only for on-the-job injury is "disparate treatment [that is] clearly intentional, but ... does not equal unlawful discrimination, because the disparate treatment complained of does not involve a classification that singles out pregnancy-based disability for less favorable treatment.").[8]

■ PDA claims are analyzed just like any other Title VII claim, where a plaintiff bears the ultimate burden of persuading the fact finder that the defendant intentionally discriminated against her. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A plaintiff may carry this burden through direct evidence or by introducing circumstantial evidence that supports an inference of discrimination. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566–67 (6th Cir.2001).

■ If plaintiff's case is circumstantial, it must follow the familiar three-step framework of *McDonnell Douglas v.*

---

**8.** Although recognizing that this is the law, the Court must confess to considerable discomfort over a policy like the one here which denies light-duty work to pregnant employees while granting it to employees injured on the job. Although the Court recognizes the economic realities that drive such a policy, it also recognizes how difficult that policy makes it for certain women in the work force. The policy, arguably, has the effect, even if unintended, of making it extraordinarily difficult for women to function in certain work forces, especially those involving tasks which, although ordinarily not a problem for women to perform, become a problem for a short time during pregnancy, especially during a problem pregnancy. Women are the only employees who have the capacity to be pregnant and, in this Court's view, it would behoove Congress to statutorily provide for some accommodation for pregnancy, as a matter of public policy. It seems that there must be some way of easing the burden on women, while at the same time avoiding a falsely "protective" law which would only "perpetuate[ ] women's second class status in the work place." *Carney,* 824 F.2d at 647.

That having been said, the Court also recognizes that the very same argument about "easing the burden" could be made with respect to employees who face other medical crises (e.g., cancer treatments) that render them temporarily unable to fully perform their job duties, but not completely incapable of performing. It just seems that it is in all of society's best interests to accommodate these realities of life. In the Court's view, the more loyalty an employer shows *to* employees, the more loyalty that employer is likely to receive *from* employees.

*Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as later clarified by *Tex. Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, the plaintiff bears the burden of making a prima facie showing by demonstrating that (1) she was pregnant, i.e., a member of the protected class; (2) she suffered an adverse employment action; (3) she was qualified for the job she lost; and (4) she was replaced by someone outside the protected class or, in the alternative, a comparable non-protected person was treated better. *Ensley–Gaines,* 100 F.3d at 1224.[9] If the plaintiff carries that burden, then, to rebut the presumption of discrimination, the defendant must come forward with a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. If the defendant meets its burden, the presumption of discrimination drops from the case and, in the final stage of the process, the plaintiff may demonstrate that the defendant's proffered reason is a mere pretext for intentional discrimination. *Id.* at 142–43, 120 S.Ct. 2097. The burden of proof remains at all times on the plaintiff to prove intentional discrimination.[10]

## B. Analysis

Wayne–Dalton asserts that it has a very strict policy and procedure of terminating employees who are unable, for any reason, to return to full-duty work following a 30–day leave of absence. The policy applies to all employees including those who, due to pregnancy, are unable to return to full duty after a 30–day leave. Plaintiff asserts that this is *not* Wayne–Dalton's policy and points to several employees she claims were accommodated in various ways, whereas she was not offered the same opportunity for accommodation.

9. For purposes of this analysis, the Court will assume plaintiff has established the first three elements even though noting that defendant has pointed out that, under its points-system absentee policy (where an employee is given a written warning upon accumulating 5 points for absenteeism and is terminated for 6 points), plaintiff had already accumulated 4½ points as of November 22, 2002, just 5 months after she was hired. Although she might have been technically "qualified" for her position, her performance (or lack thereof due to absenteeism) arguably rendered her unqualified, since, to establish the third element of a prima facie case, a plaintiff must show that she was performing her job at a level which met defendant's reasonable expectations. *See McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990).

10. In *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184 (10th Cir.2000), the court addressed the question of "whether an employer may defeat a plaintiff's prima facie case by challenging the plaintiff's qualification for the position on the grounds she has failed to meet an objective qualification that is not essential to the performance of the job." *Id.* at 1192.

The employer was arguing that the pregnant employees who sought modified-duty positions were not qualified for such positions because they had not been injured on the job and, therefore, could not establish the "qualified" prong of their prima facie cases. However, the *Horizon* court held:

> [w]hen an employee's failure to meet objective, employer-imposed criteria is one of the legitimate, non-discriminatory reasons advanced by an employer to dispel the inference of discrimination raised by an employee at the prima facie stage, it cannot also be used to defeat the employee's prima facie case.

*Id.* at 1193. The court determined that, to hold otherwise, "would deny a plaintiff the opportunity to demonstrate that the defendant's explanation for the adverse employment action is pretextual." *Id.* That is,

> allowing a defendant to rely on subjective qualifications to defeat a plaintiff's prima facie case would deny the plaintiff the opportunity to demonstrate that those subjective criteria were a means to effect a discriminatory action.

*Id.* at 1192 (citing *Burrus v. United Tele. Co. of Kan.,* 683 F.2d 339, 341–42 (10th Cir.1982)).

At one time, Wayne–Dalton's employee handbook [11] made provision for a leave of absence for personal reasons, as follows:

#### 4.08 Leave of Absence

A leave of absence is an extended period of time absent from work without loss of employment. Leave of absence without pay. The employee must pay premiums for benefit coverage to the company.

#### A. PERSONAL LEAVES OF ABSENCE

Wayne–Dalton has a policy of granting personal leave of absence in a few well-defined cases. A personal leave of absence may be granted by Wayne–Dalton up to a maximum of 30 days after all vacation time is exhausted. An extension beyond 30 days will be considered in the event of serious or extenuating circumstances.

Effective February 28, 2002, Wayne–Dalton promulgated the following policy with respect to personal leaves of absence:

Personal leaves of absence may be granted to employees in crucial situations up to a maximum of 30 days. Employees must be employed three (3) months and have used all available vacation days.

Employee personal leave time is any thirty (30) calendar days taken within twelve (12) continuous months.

A request form should be completed and forwarded for management approval, before leave is granted.

If an employee fails to return to work, full-duty, within thirty (30) days, employment will be terminated.

It was *this* policy, not the more general policy in the employee handbook, which was in place both at the time plaintiff was first hired and on May 8, 2003, when she requested and was granted her leave. Wayne–Dalton argues that it followed this policy for the plaintiff as scrupulously as it did for all other employees. Wayne–Dalton admits that it maintains a so-called "light-duty" work program, but asserts that it is available only to workers who are injured on the job and is not available to *any* other worker, pregnant or not.

Plaintiff claims that Wayne–Dalton's policy regarding light duty, coupled with its personal leave policy, violates the teaching of *Ensley–Gaines, supra,* which held that the relevant comparable persons for purposes of the prima facie case are other employees who are "similarly situated in [their] ability or inability to work." 100 F.3d at 1226. Plaintiff points to nine employees as having been treated more favorably than she: Harry Emerson, Curtis Sinnett, Nathan Chait, Sharylin McCombs, Jessika White, Rhonda Walker, Brenda Bailey, Asa Anslow and David Crouch.

The Court will address each of these nine employees, even though the plaintiff has made *no* effort to explain how any of these employees are truly comparable to her, other than that they apparently sought personal leave.[12] Except for three of these employees, plaintiff does not even identify their job titles or make any attempt to explain how their jobs were comparable to her position of Hardware Assembler C.

Plaintiff asserts that five of these "comparable" employees were given personal leave for periods in excess of 30 days. Plaintiff claims that employee Emerson was an Assembler B for only seven months

---

11. Page 29 of the handbook is attached to the complaint; however, there is nothing in the complaint or on the exhibit itself which *dates* the policy stated therein.

12. Strictly speaking, under Rule 56, the Court could ignore all of these assertions as unsupported.

when defendant granted him personal leave from June 11 to July 16, 2001 for a non-work-related back injury.[13] She claims employee Sinnett, whose job is not identified, was hired on October 2, 2000, was granted an indefinite leave effective May 14, 2001, and was not terminated until August 24, 2001. Plaintiff claims that employee Chait, whose position is not identified, was hired on October 19, 2001, granted personal leave "for at least 30 days" beginning January 10, 2002, and was not terminated until February 20, 2002. Employee McCombs was purportedly hired on September 11, 2000 for an unidentified position and was granted personal leave from May 14 to July 14, 2001. Finally, employee White, whose job is also not identified, was granted a leave from June 14, 2000 and was not terminated until October 23, 2000.

Plaintiff asserts that the remaining four "comparable" employees were given light duty for non-work-related injuries. Plaintiff states that, in 2003, employee Walker, a production worker,[14] was allowed a modified schedule to help her cope with exhaustion brought on by cancer treatments.[15]

Employee Bailey, an inspector who worked the plant floor and needed to wear steel-toed shoes to perform her job, was temporarily moved to an office job in 2001 when she broke her leg and had exposed toes due to her cast. Employees Anslow and Crouch were apparently, until recently, given light duty for non-work-related injuries, but those accommodations were abruptly discontinued when upper management became aware of them and instructed the supervisor of those employees that the leave policy did not permit such special treatment.

■ Aside from Anslow and Crouch, who were given accommodations mistakenly and lost them immediately upon discovery of the mistake,[16] and Walker, whose leave might also have been granted mistakenly but who, in any event, was entitled to FMLA leave,[17] *all* of plaintiff's other examples are of people who got leave *before* February 28, 2002 when the new personal leave policy was adopted. Their leaves were not, in other words, governed by the same policy as plaintiff's leave. Therefore, these persons are not comparable persons for plaintiff's purposes.[18]

13. Plaintiff does not explain the job of Assembler B, nor does she compare it in any way to her job of Assembler C, which required 10–hour shifts and frequent lifting in excess of 40 pounds.

14. Plaintiff does not describe the job of production worker or compare it in any way to her job.

15. The Court notes that Walker had worked at Wayne–Dalton since 1997 and, *unlike* plaintiff who had worked there for only a few months, would have been eligible for leave under FMLA. Even so, Jill Samuelson, the Director of Human Resources for the defendant, testified at her deposition that the accommodation given to Walker was "not authorized" but had been given by "a former HR manager at the Mount Hope plant[.]" (Samuelson Dep. at 31).

16. The fact that Anslow and Crouch did not lose their jobs when this mistake was discovered would not be surprising. The mistake was not theirs; it was their supervisor's. There is nothing in this record to suggest that the supervisor was not disciplined for the mistake.

17. Unfortunately, because plaintiff had not been employed long enough by defendant, she was not entitled to FMLA leave. At least if she had had that kind of leave available to her, she would not have been terminated from her job, even though she *would* have had to take the leave *without* pay, which is not quite as good an alternative as continuing to work under a light-duty schedule.

18. The mere fact that an employer at one time in the past, pursuant to the then-governing leave policy, gave employees leave under conditions that would not pass muster under the

What matters is how Wayne–Dalton applied the new policy—whether it was applied the same for all employees, or whether some employees (e.g., pregnant employees) were treated differently under the policy. Plaintiff has not identified a single person who was treated more favorably than she was under Wayne–Dalton's present policy.

Here, when her 30–day leave was up, plaintiff was not able to return to full duty, which included 10–hour shifts and lifting as much as 40 pounds at a time, because her doctor had limited her to 8–hour days and lifting no more than 20 pounds. She was no longer able to do her job as it was defined for all persons who held that job. This would have been so even if the *reason* for her inability to do the job had been, for example, a back injury rather than pregnancy. On the form plaintiff signed when requesting her leave, she acknowledged that "if I fail to return to work, full-duty, within 30 days, my employment with Wayne–Dalton, will be terminated."

■ Furthermore, plaintiff's reliance on *Ensley–Gaines* is misplaced. *Ensley–Gaines* held that

> the PDA explicitly alters the analysis to be applied in pregnancy discrimination

cases. While Title VII generally requires that a plaintiff demonstrate that the employee who received more favorable treatment be similarly situated "in all respects," *Mitchell*, 964 F.2d at 583, **the PDA requires only that the employee be similar in his or her "ability or inability to work."** 42 U.S.C. § 2000e(k).

*Id.* at 1226 (emphasis added). *Ensley–Gaines* really only stands for the narrow proposition that, for purposes of establishing the fourth element of the prima facie case, the "comparable" or "similar" employee is the one who is similar in ability or inability to work.[19] Even if this Court were to conclude, which it cannot, that *all* of the nine employees that plaintiff points to met the *Ensley–Gaines* test, that would only get plaintiff past the prima facie case. Defendant would still prevail by coming forward with a nondiscriminatory reason for its treatment of plaintiff, namely, that under the policy adopted in February 2002, it required *all* employees who took personal leave for *any* reason, except an on-the-job injury, to return to work after 30 days or be terminated.

The issue here is not whether this Court thinks this is a fair or kind employment

now-governing policy, does not mean that the employer is forever "stuck" with that fact. Employees who were given leave under a *different* policy are not comparables.

19. *Ensley–Gaines* has been criticized by other courts as actually "effectuat[ing] discrimination contrary to the PDA—in favor of pregnant employees." *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 207. (5th Cir.1998) (where the employer's policy of granting light duty only for on-the-job injuries was upheld as non-discriminatory to pregnant employees); *see also, Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1313 n. 2 (11th Cir.1999) (adopting *Urbano* and rejecting *Ensley–Gaines*).
    Furthermore, even the Sixth Circuit does not seem too enthralled with *Ensley–Gaines*

as this Court has found only one unpublished Sixth Circuit case which cites *Ensley–Gaines* for its proposition that the "comparable persons" analysis should center on similar "ability or inability to work." That case, in the end, affirmed the district court's grant of summary judgment to the employer and concluded "that *Ensley–Gaines* [was] not determinative of the specific issue in this case." *Raciti–Hur v. Homan*, No. 98–1218, 1999 WL 331650, at *5 (6th Cir.1999) (per curiam) (defendant did not discriminate on the basis of pregnancy by denying plaintiff's request to be assigned a dispatcher's position during her pregnancy while maintaining the higher salary of her regular position of road patrol deputy; plaintiff was allowed to be a dispatcher but only at a dispatcher's pay).

policy. *See Armstrong,* 33 F.3d at 1317 ("Title VII simply does not require employers to treat their employees with kindness.") The issue is whether the policy is uniformly applied by the employer. In this case, it is.

The instant case is much like the case of *Hensley v. Boddie–Noell Enterprises, Inc.,* No. 98–6125, 2000 WL 799781 (6th Cir. June 14, 2000). Like plaintiff, Hensley experienced a problem pregnancy that made it impossible for her to return to work after she was granted a short leave of absence. Like plaintiff, when Hensley requested leave, she signed a form which included the statement: "It is understood that in the event I do not report to work at the expiration of above leave, unless properly authorized extension has been granted, I will be deemed to have quit." Hensley was terminated for failure to return or get an extension. The district court granted summary judgment to the employer. On appeal, the Sixth Circuit pointed out: "As to the fourth element, the district court found that Hensley had not presented any evidence that she was treated any differently than any other person, pregnant or otherwise, who failed to return to work upon expiration of an approved leave." *Id.* at *5. *See also, Stout v. Baxter Healthcare Corp.,* 282 F.3d 856 (5th Cir.2002) (upholding termination of probationary employee who suffered a miscarriage which resulted in absences in excess of that permitted by the employer's probationary employee attendance policy, concluding that her termination was not "because of" her pregnancy); *Spivey v. Beverly Enterprises Inc.,* 196 F.3d 1309 (11th Cir.1999) (employer did not violate PDA by offering modified duty only to employees injured on the job, which did not

include plaintiff who sought such duty due to lifting restrictions incident to pregnancy); *Sermons v. Fleetwood Homes of Georgia,* 227 F.Supp.2d 1368 (S.D.Ga.2002) (granting summary judgment to employer who fired a pregnant employee whose lifting restrictions rendered her incapable of performing any available job, concluding that employer's policy of assigning light duty only for job-related injuries was a legitimate non-discriminatory reason for terminating employee).

Plaintiff is unable to show that her employment was terminated "because of" her pregnancy or that she was treated differently from other similarly-situated employees. Rather, defendant has articulated a legitimate, non-discriminatory reason for the termination, namely, its uniform application of the policy to terminate employees who fail to return to full-duty work after the expiration of a 30–day personal leave of absence. Whether defendant's policy is used to defeat the fourth element of the prima facie case or to establish a non-discriminatory non-pretextual reason for the adverse employment action, defendant is entitled to summary judgment.

## IV. CONCLUSION

For the reasons set forth above, plaintiff's motion for partial summary judgment (Doc. No. 34) is DENIED and defendant's motion for summary judgment (Doc. No. 20) on plaintiff's pregnancy discrimination claim under both federal and state law [20] is GRANTED. The Court declines to exercise its supplemental jurisdiction over the remaining state law claims of public policy tort claim and intentional infliction of emo-

---

**20.** State law claims of discrimination are analyzed in the same fashion as federal claims under the burden-shifting framework of *McDonnell Douglas. See, Genaro v. Central*

*Transport, Inc.,* 84 Ohio St.3d 293, 295, 298, 703 N.E.2d 782 (1999); *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.,* 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

818

tional distress and the same are dismissed without prejudice.

IT IS SO ORDERED.

*JUDGMENT ENTRY*

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that summary judgment is granted in favor of the defendant with respect to plaintiff's claims of discrimination on the basis of pregnancy under both federal and state law. Further, declining to exercise supplemental jurisdiction of the state law claims of public policy tort and intentional infliction of emotional distress and dismissing the same without prejudice. Case closed, with each party to bear its own costs.